Irwin C. BANDEMER, Obi Badili, Ra-Nelle Pearson, George Womack Jr., Edward O'Rea, John Higbee, David Scott Richards, Plaintiffs,

v.

Susan J. DAVIS, John Livengood, and Thomas S. Milligan, as members of the Indiana State Election Board; Laurie Potter Christie, as Executive Director of the Indiana State Election Board; and Edwin J. Simcox, Secretary of State of the State of Indiana, Defendants.

INDIANA N.A.A.C.P. STATE CONFERENCE OF BRANCHES; Indianapolis Branch, N.A.A.C.P.; Fort Wayne Branch N.A.A.C.P.; Gary Branch N.A.A.C.P.; East Chicago Branch; Thomas Bunnell; Edward Richardson; James E. Clark; Bervin E. Caesar; Elizabeth Dobynes; Dr. Benjamin Grant; John Stott; and Eunice Roper Allen, Plaintiffs,

v.

Robert D. ORR, Governor, State of Indiana; Susan J. Davis, John Livengood, and Thomas Milligan, Members, Indiana State Election Board; Laura Potter Christie, Executive Director, Indiana State Election Board; Edwin J. Simcox, Secretary of State, State of Indiana; J. Roberts Dailey, Speaker, Indiana House of Representatives; Robert D. Garton, President Pro Tem, Indiana State Senate; Richard Mangus, Chairman, Standing Committee on Elections and Apportionment, House of Representatives and Charles Bosma, Chairman Standing Committee of Legislative Apportionment and Elections, State Senate, Defendants.

Nos. IP 82–56–C, IP 82–164–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Dec. 13, 1984.

Theodore R. Boehm, Christopher G. Scanlon, John B. Swarbrick, Jr., Indianapolis, Ind., for plaintiffs in No. IP 82–56–C and for defendants in No. IP 82–164–C.

William M. Evans, Michael T. Schaefer, Deputy Atty. Gen., Indianapolis, Ind., for defendants in No. IP 82–56–C.

Thomas I. Atkins, Michael H. Sussman, Brooklyn, N.Y., Dennis C. Hayes, Indianapolis, Ind., for plaintiffs in No. IP 82–164–C.

Before PELL, Senior Circuit Judge, NOLAND, Chief Judge, and BROOKS, District Judge.

## OPINION

NOLAND, Chief Judge, and BROOKS, District Judge.

These Findings of Fact and Conclusions of Law are entered in the above-captioned causes in memorandum form, pursuant to Rule 52(a), Federal Rules of Civil Procedure.

These lawsuits were heard by a three-judge panel appointed by The Honorable Walter J. Cummings, Chief Judge, Seventh Circuit, United States Court of Appeals. United States Circuit Judge Wilbur F. Pell, Jr., presided over the panel which heard testimony on October 12, 1983, and November 16, 1983, in addition to the admission of several maps and documents as evidence in the cases. Oral arguments on behalf of all parties were heard January 23, 1984 after submission of post-trial briefs.

Both lawsuits were heard pursuant to 28 U.S.C. § 2284 which requires the appointment of a three-judge panel when legislative reapportionment is challenged. On January 23, 1984 the panel announced unanimously that while its opinion would be entered as soon as possible, the effec-

tive date of the decision would be subsequent to the conduct of the 1984 election.

## PARTIES–COMPLAINTS

On January 12, 1982, the IP 82–56–C lawsuit was filed in the Southern District of Indiana, Indianapolis Division, by seven (7) plaintiffs, all stipulated as citizens of Indiana and members of the Democratic Party: Irwin C. Bandemer, Obi Badili, Ra-Nelle Pearson, George Womack, Jr., Edward O'Rea, John Higbee, and David Scott Richards. The defendants in the lawsuit (hereinafter referred to as the "Bandemer case") were Susan J. Davis, John Livengood, and Thomas S. Milligan, members of the Indiana State Election Board; Laurie Potter Christie, Executive Director of the Indiana State Election Board; and Edwin J. Simcox, Secretary of State for the State of Indiana.

On February 2, 1982, the IP 82–164–C lawsuit was filed in the Southern District of Indiana, Indianapolis Division, by five (5) organizations—The Indiana N.A.A.C.P. State Conference of Branches, along with the individual branches from the cities of Indianapolis, Fort Wayne, Gary, and East Chicago—and eight (8) individual citizens of Indiana: Thomas Bunnell, Edward Richardson, James E. Clark, Bervin E. Caesar, Elizabeth Dobynes, Dr. Benjamin Grant, John Stott, and Eunice Roper Allen. The defendants in the lawsuit (hereinafter referred to as the "NAACP case") include Indiana Governor Robert D. Orr, Indiana Speaker of the House J. Roberts Dailey, Indiana Senate President Pro Tem Robert D. Garton, the chairmen of the legislative committees on elections and apportionment, Richard Mangus and Charles Bosma, and all defendants previously listed in the Bandemer case. The panel ruled both cause numbers would be consolidated for all purposes, including trial, by order dated May 3, 1982.

In summary, the Bandemer case plaintiffs allege that the Indiana apportionment law enacted by the state legislature and signed by the Governor into law in 1981 was intended to, and does, discriminate against Indiana Democrats. They claim that such is a violation of Fourteenth Amendment guarantees of equal protection as well as Indiana constitutional prohibitions against treating electors unequally (Ind. Const. art. 2, § 1) and unnecessary division of counties in Senate districting (Ind. Const. art. 4, § 6).

In summary, the NAACP case plaintiffs allege the House redistricting plan included in that 1981 apportionment act and amendments thereto intentionally fragments black population concentrations in Lake and Marion counties.

## THE INDIANA LEGISLATURE

The Indiana Constitution provides for a bicameral state legislature which is denominated "the General Assembly" and consists of a House of Representatives and a Senate. Ind. Const. art. 4, § 1. The Indiana Senate (hereinafter "the Senate") consists of fifty (50) members representing identified districts of the state. Apportionment of those districts is done by legislative act and signed by the Governor into law. The members of the Senate serve four-year terms. The terms are staggered in that only one-half of the members are subject to re-election during a traditional even-numbered general election year. The Indiana House of Representatives (hereinafter "the House") consists of one hundred (100) members who also represent identified districts in the state. Apportionment of those districts also is done by legislative act and signed into law by the governor. The members of the House serve two-year terms, thus placing the entire membership in elections every two (2) years.

The state legislature (referred to as the "General Assembly" in future references to the combined legislature) meets for a finite term of days. In other words, the General Assembly is not a full-time legislature. A "regular session" of the General Assembly occurs during the first calendar year of a two-year term. Thus, in odd-numbered years, the General Assembly meets in a "regular session". By law, the General Assembly may convene for sixty-

one (61) session days, but in no event may it conduct business beyond April 30. During the second year of the two-year term, an even-numbered year, the General Assembly is empowered to meet for thirty (30) session days. The session may not extend beyond March 15. See, Ind.Code §§ 2–2.1–1–1(a), 2–2.1–1–3. The Governor is empowered by the state's constitution to call the General Assembly into special session, regardless of the other restrictions on the length and time of session. Ind. Const. art. 4, § 9.

The Indiana Constitution also requires the General Assembly to authorize a "periodical enumeration" of the state's population and authorizes that legislative body to apportion representation thereafter. Traditionally, the state makes use of the federal decennial census compilations in performing reapportionment.

Control of the General Assembly is crucial to a political party for a number of reasons. The majority party elects the Speaker of the House, a person who wields considerable power in the assigning of bills to committees, the conduct of the actual legislative sessions, and is empowered, under legislative rules, to prevent bills from reaching the floor for debate or vote. Similarly, the majority party elects floor leaders in both houses who control the flow of legislation, the assignment of members to committees, and the appointment of committee chairmen. All of these powers are important to the achievement of a party's legislative goals. There is little doubt that the minority party plays a less substantial role in the drafting and enactment of legislation.

## 1981–1982 REAPPORTIONMENT LEGISLATIVE PROCESS

Among the issues raised in both lawsuits is the process by which the General Assembly enacted reapportionment laws in the 1981 and 1982 sessions. Following the 1980 census conducted by the United States Census Bureau, the General Assembly commenced the process of reapportioning

the state based on compilations it received from that agency.

On February 13, 1981, House Bill 1475 (H.B.1475) was introduced in the Indiana House as being relevant to reapportionment. Similarly, Senate Bill 80 (S.B.80) was introduced on February 24, 1981. These bills are characterized as "vehicle bills." The actual bills filed in the legislative houses were devoid of significant content. For instance, the House bill sought to amend the definitional section of reapportionment law for that body. There was no description of districts and the bill itself was quite brief. The substance appeared to be only a 12-line paragraph. A similar bill containing three (3) paragraphs was introduced as S.B. 80. The bills were passed in that form and were referred to the other house where amendments were made. In practical terms, the bills were blank, the amendments insignificant, and the sole purpose for this contrived legislative process was to refer both bills to a conference committee.

The political structure of the conference committee introduces a crucial element into the legislative scheme chosen by the Republican majority in both houses of the General Assembly. All conferees were Republicans—State Senators Charles E. Bosma and James Abraham and State Representatives Richard W. Mangus and Norman L. Gerig. All were members of their legislative body's respective elections and apportionment committees. The lone Democrats with any input in the conference process were four persons appointed as "advisors": W. Wayne Townsend, Julia M. Carson, Lindel O. Hume, and Thomas S. Kromkowski. The Democratic advisors had no committee vote and no access to the mapmaking process that ensued.

To aid in the process of legislative mapmaking, the Republican State Committee, a political organization, contracted with a Detroit, Michigan computer firm, Market Opinion Research, Inc. (hereinafter "MOR"). The Republican State Committee paid Two Hundred Fifty Thousand Dollars ($250,000.00) for MOR's services and the

computer equipment was housed in State Committee headquarters. There was limited access to the equipment and its output, and no minority party members ever had access to the information provided to MOR or to the various outputs from the computers.

Meanwhile, the minority party members did have census compilations provided by the United States Census Bureau from which they began drawing their own map, albeit by less sophisticated means than their Republican counterparts. During these early months of 1981, there were no hearings of any kind with respect to reapportionment. The majority party, through its conference committee, revealed the product of the MOR-aided map drawing during the last week of the regular session. At the same time, the Democrats revealed their proposed maps, introduced by black legislators Rep. William Crawford and Sen. Julia M. Carson (hereinafter referred to as the "Crawford Plan" and the "Carson Plan"). These alternative plans are relevant to both the Bandemer and NAACP cases.

The process underlying the reapportionment proceedings was fiercely competitive and unashamedly partisan. There is a clear impression that the majority party felt insulated from challenge merely by adherence to the "one-person, one-vote" principle, which they could easily follow with the aid of a computer. The result of that attitude is revealed in the remarkably candid statements of both Speaker Dailey and Senator Bosma in their deposition testimony:

MR. SUSSMAN: What I would like you to do here again is to give me whatever reasons were operative to your mind in maintaining or creating multi-member districts with regard to (Districts) 48 through 52.

MR. DAILEY: Political.

MR. SUSSMAN: What were the political factors?

MR. DAILEY: We wanted to save as many incumbent Republicans as possible.

\* \* \* \* \* \*

MR. SUSSMAN: This (newspaper) article says further, "Under further questioning from Townsend about input in actual map drawing, Bosma said 'You will have the privilege to offer a minority map. But I will advise you in advance that it will not be accepted.'" Is that accurate?

MR. BOSMA: That's accurate. I might add that I don't make goals for the opposite team.

After a limited floor debate, the conference committee report was introduced for vote in both houses of the General Assembly on April 30, the final day of the 1981 regular session. The Senate adopted the report (Roll Call 673) along party lines, 33–15. The House similarly adopted the report (Roll Call 844) along party lines, 59–40. The Indiana Journal reports comments by Senator Townsend for April 30, 1981 that the Democrats had only 40 hours to review the districting of more than 4,000 precincts. The Governor signed the bill into law on May 5, 1981. The matter was then settled until the following year when, during the 1982 short session, certain revisions were made to add parts of the state to districts which had been wholly omitted in the 1981 legislation.

## THE REDISTRICTING PLAN

The result of the General Assembly's work is evident to the Court through a number of exhibits and maps. Fifty (50) districts were drawn for the Indiana Senate; seventy-seven (77) districts were drawn for the Indiana House. The House districts are comprised of sixty-one (61) one-member districts, nine (9) two-member districts, and seven (7) three-member districts. (See attached Court Exhibits A and B, the House and Senate Districts, respectively, as supplied by the Indiana Legislative Council.)

The districting was not a "nested" plan, that is, the House districts drawn are not at all relevant to the Senate districts. A true "nested" plan would include, for ex-

ample, two House districts within one Senate district. The districts for each house of the General Assembly were drawn independently of each other, making it at least possible that citizens represented by the same House member might well be represented by different Senate members.

There is no evident pattern to the redistricting plan. No clear policy statements are evident to the Court from either the debate on the bills or the documents presented to the Court. The deposition testimony of the legislative principals involved makes clear that Supreme Court guidelines summarized as "one person-one vote" were carefully followed. The defendants also now state that a policy of "no retrogression" also guided the decisions made by the legislative mapmakers. "No retrogression" was an effort to preserve the constituencies for black members of the General Assembly that existed prior to the 1980 census. The census figures revealed a certain migration of minority citizens from inner city areas in which they had commanded considerable voting strength.

The common denominator in the districting is the precinct. Although township lines have been observed in most instances, township lines also were bisected on occasion.

The population deviations between districts in the House plan was 1.05 percent; the population deviation in the districts of the Senate plan was 1.15 percent.

A. *Impact of the Redistricting Plan on Democrats (the Bandemer plaintiffs)*

Indiana is historically a "swing" state which has been generous in its support of both Democrats and Republicans, dependent largely on national trends, the parties' candidates for nationwide office, and the major candidates for statewide office. As a consequence, Democrats scored substantial victories in 1974, 1964, and 1958 when up to 56 percent of the state's vote went to Democratic candidates. Similarly, Republicans scored large victories in 1980, 1972, and 1956 (all landslide years for Republican presidential candidates) when up to 58 percent of the state's vote went to Republican candidates. The Court finds these figures to be credible evidence of flux in Hoosier political emotions.

Statistics introduced in the instant case have compelled scrutiny by the Court. The parties have presented voluminous statistical data and argue the figures support their positions in this lawsuit. This Court does not wish to choose which statistician is more credible or less credible. Instead, the Court refers to some basic statistical foundations which appear credible and reliable in making determinations about the impact of the '81–82 redistricting plan on Democratic candidates.

Most significant among these many statistical figures is the fact that in 1982 Democratic candidates for the Indiana House earned 51.9 percent of all votes cast across the state. However, only 43 Democrats were elected to seats. The State argues that it is possible that this disparity is explained by the Republicans fielding better candidates or other factors which make the outcome of such elections sensitive to the interests of the voters and the issues of the day. The Court would readily concede this possibility, but the disparity between the percentage of votes and the number of seats won is, at the very least, a signal that Democrats may have been unfairly disadvantaged by the redistricting.

In addition, there has been dispute between these parties about what constitutes a competitive race, *i.e.,* an election close enough to be determined by candidate personality and positions rather than party loyalty. The Republicans argue that any race between 40 and 60 percent constitutes a "competitive" race; the Bandemer plaintiffs contend that, given Indiana's history of party-line voting (a fact to which the defendants' expert conceded in his testimony), a 45–55 percentage range is a more apt definition of "competitive" in Indiana politics. The Court would agree that the latter figure is more realistic in light of the facts and political history.

The 1982 legislative elections, which were conducted according to the districting challenged in this lawsuit, yielded the following results:

—In the Indiana House, all 100 seats were up for election. Seventeen candidates ran unopposed. Democratic candidates received 872,430 votes statewide, or about 51.9 percent of the vote. Republican candidates received 808,681 votes statewide, or about 48.1 percent of the vote. Fifty-seven Republican candidates were elected to serve in the Indiana House; forty-three Democrats were elected to the House.

—In the Indiana Senate, 25 seats were up for election. Democratic candidates received 454,849 votes statewide, or about 53.1 percent of the vote. Republican candidates received 402,492 votes, or about 46.9 percent of the vote. Thirteen Democrats and twelve Republicans were elected to Senate seats.

As the defendants' expert testified, such figures can be deceiving. Voter concentrations, particularly of Democrats in urban areas, can make compilations of *total* vote for a particular party's candidates across the state misleading. A heavy turnout of Democratic voters in a heavily Democratic area of the state can skew these total vote figures. For example, a Democratic candidate who wins by a large percentage in a given district wins one seat, but two Republicans who win by much smaller majorities in other districts have been elected with considerably smaller expenditure of votes. If the votes were totaled for all three races, it is conceivable that Democratic candidates may have earned the most votes, but that two Republican candidates have been elected compared to one Democrat. Thus, this kind of vote analysis presents dangers of misrepresentation. However, the Court believes this kind of analysis to present the precise problem to which the Bandemer plaintiffs refer. In short, the majority party has been able to draw maps which will permit it to win close races in certain districts by "stacking" Democrats into a minority of districts where their strength is overpowering.

There is little doubt that a well-programmed computer, full of the most recent election results in Indiana's 4,000-plus precincts, can aid in the drawing of lines advantageous to the party in power. As a result, the figures before the Court, even when looked upon with restraint, would seem to support an argument that there is a built-in bias favoring the majority party, the Republicans, which instituted the reapportionment plan. No party to this lawsuit has attempted to state that the figures have any value as a predictor of future election outcomes, and the Court makes no such reading of the statistics. However, even the suspicion of this kind of built-in bias against the Democrats, represented by these plaintiffs, arouses the Court's concern and urges a closer look at the circumstances surrounding the passage of this reapportionment plan.

B. *The Shapes of the Districts as a Factor in the Court's Analysis*

The Court acknowledges the historical existence of so-called "gerrymandering" of districts, a device which has been used by both major political parties and which is claimed to have occurred in this case by the Bandemer plaintiffs.

The approach used by the majority party in this instance presents a new twist, however, in that sophisticated computer equipment obviously provided more flexibility to the mapmakers.

There is dispute as to whether parties responsible for the reapportionment plan considered "community of interest" in their line drawing enterprise. Senator Bosma, in his deposition testimony, said that "community of interest" was such a consideration. The results of the reapportionment maps would appear to undercut that assertion. This Court's understanding of "community of interest" would be, generally speaking, the inclusion of citizens in a given legislative district who share a geographic area, with similar concerns and needs to be met by their state legislators. A scrutiny of the maps instituted by the General Assembly discerns a lack of any

*consistent* application of "community of interest" principles. For instance, it is difficult to conceive the interests shared by blacks in Washington Township and white suburbanites in Hamilton and Boone counties, or the shared interest of Allen and Noble county farmers with residents of downtown Fort Wayne. The Court, however, acknowledges that some diversity will be unavoidable where urban, suburban and rural interests are in physical proximity and where adherence to "one person, one vote" makes such "melting pots" necessary. There are examples in the present maps which call the Court's attention to such phenomena. The best examples of these unusual shapes are in the House plan. (See Court Exhibit A.)

We first examine Marion County to explore this absence of "community of interest" and the existence of unusual shapes in these districts. The 51st House district is heavily Democratic and elected three Democrats to the Indiana House seats in 1982. The remainder of the county, while also populated with areas of less heavy Democratic support, was won by Republican candidates in 1982. These less heavy Democratic pockets have been split by the mapmaker to reduce the influence these voters wield. The urban Democrats who were not included in the 51st District have thus been divided into the 50th District (covering east and northeastern portions of the county), the 52nd District (south and southwest), and the 48th District (west). The shapes are unusual for a number of reasons, notably because of the necessity of adding townships from contiguous counties to preserve the 15-seat Marion County delegation to the Indiana House despite a population decrease.[1] These districts are particularly suspect with respect to compactness. District 48 presents the most grievous example of the political cartographer's handiwork in this case. District 48 forms the letter "C" around the central city of Indianapolis. The district includes portions of the urban southwestside of the city, the airport and suburban area around Ben Davis High School on the west side, and the Meridian Hills area at the northern part of the county. There is simply no conceivable justification for this kind of district, even though the district meets the requirements of "one person, one vote."

There appears to be no consideration of existing political subdivisions in the districting. District 66 is a good example of this situation. The district begins in the southwest townships of Bartholomew County, includes ten of the twelve townships in Jackson County, includes one township in Jennings County, goes through a narrow passage by taking in Johnson and Lexington townships in Scott County, then expands into Clark County until reaching the state border at the Ohio River. District 42 fills a narrow portion of the state beginning with northern Vigo County at the southern most point and extends approximately 50 to 55 miles north to include one township (Hickory Grove) of Benton County. Along the way, the district picks up one northwest township of Parke County, splits Fountain County, and includes all of narrow Vermillion County.

The west central portion of the state also provides an example of the precinct being the common denominator in the mapmaker's scheme. For instance, Districts 43 and 44 split Lost Creek Township in Vigo County.

To the south, another strange districting choice is apparent. Examining Districts 45 and 46, it is evident that Sullivan, the county seat of Sullivan County, is severed from all but one of the county's nine townships. Sullivan shares a House district with only one township to the north. The remainder of the townships share a House district with neighboring Knox County.

[1] As the Bandemer plaintiffs noted, Marion County's population constituted a so-called "perfect" figure from which 14 House seats and 7 Senate seats could have been carved to meet the population goals of "one person, one vote". Instead, the powerful Marion County delegation forced neighboring counties to cede turf to permit a preservation of the multi-member districts which had consistently returned Republicans to the Statehouse.

Allen County, where multi-member House districts are used, bisects Democratic strength in the urban area (the motivations for which are examined below). Moreover, once the Senate district lines are added to maps with House district lines and county lines, the intersection of lines and districts merely amplifies what must be confusion to the citizens of that county.

Therefore, it is apparent to the Court that the shapes of many of the districts, with particular emphasis on the House plan, are often contorted, with little apparent emphasis on "community of interest", do not adhere to any remote definition of compactness, and likely have resulted in confusion to voters.

### C. Motivations for the Districting Plan Adopted in 1981–1982

The principal consideration apparent in the results of the reapportionment legislation and in the testimony of the legislative architects of the plan was adherence to "one person, one vote." It is quite clear that this was an unavoidable constitutional consideration in light of United States Supreme Court decisions. In addition, there is evidence to support the defendants' contention that the concept of "no retrogression", that is, maintaining the black representation in the General Assembly that existed prior to the new districting plan, also was of concern to legislators. As should be clear from the other fact-findings, there was no apparent concern for either "community of interest" or compactness of districts.

Other motivations also are evident, most notably an effort by the majority party to insulate itself from risk of losing its control of the General Assembly. Speaker Dailey and Senator Bosma, as noted earlier, make no apology for this effort. There is no refuting that the Republican majority focused on protecting its incumbents and creating every possible "safe" Republican district possible, and that this was achieved by either "stacking" Democrats in districts where their majority would be overwhelming or by "splitting" any Democratic Party power with district lines, thus giving Republican candidates a built-in edge, even in competitive districts. While not surprising as a part of the "political game", its effect must be viewed and tested with regard to constitutional guidelines.

The defendants have further argued that "proportionality" also was a consideration. This argument insists that black representation under the '81–82 plan equals the proportion of black citizens now living in Indiana. This argument is similar to the "no retrogression" argument and, furthermore, seems to represent hindsight and chance—an argument asserted after the accidental fact of proportional representation.

### D. Use of Multi-Member Districts

The Bandemer and NAACP plaintiffs allege that the use of multi-member districts in drawing the House maps unconstitutionally impinges upon their franchise rights. In reviewing these contentions, the Court has found that the disadvantaging effect of the plan's multi-member districts falls particularly hard and harsh upon black voters in the state.

It is evident to the Court that blacks in this state for a number of years have had an identifiable and predictable tendency to vote for Democratic candidates and also have a tendency to vote as a bloc. Because blacks comprise 8 percent of the state's population and occupy, for the most part, the urban areas of the state, they also find themselves in multi-member districts under the House plan adopted in '81–82. Of Indiana's total population, 39 percent of its citizens are in multi-member districts. Among blacks, 81.2 percent of the population resides in multi-member districts. An estimated 65 percent of the white population, by comparison, resides in single member districts. In addition, other evidence indicates that only 43 percent of the blacks living in multi-member districts live in a so-called minority/majority district, i.e., they reside in a district where blacks comprise a majority of the voters.

During the legislative process leading to these reapportionment plans, several members of the House were contacted about the continuation of multi-member districts. This was done particularly for those incumbents who represented multi-member districts. In at least one instance, all members representing an existing multi-member district chose to break up that area into single member districts. The legislative leaders agreed to do so where all members representing that district were in agreement. The other justifications for continuing the multi-member district approach have been discussed. It is obvious that political considerations figured highly in the perpetuation of this sort of districting approach.

Multi-member districts are confined to urban areas, but there is no particular pattern which is applied consistently. Some major cities are included in multi-member districts, others are not. No particular consideration was given to existing political boundaries. The history of multi-member districts in Indiana is sketchy. Multi-member districts have been in use during this century, but it was not until 1972 that areas larger than a county were so apportioned to create a House district. Deviation from this approach is most evident in the '81–82 plan where Marion County representatives convinced legislators to include neighboring townships in other counties in their districts to preserve the 15-person delegation to the House.

The multi-member district approach is particularly effective in "stacking" blacks into large majority districts and fragmenting their population among other districts. An alternative plan was presented to the General Assembly by Representative Crawford which would have eliminated all multi-member districts and created 100 single-member districts. The plan was virtually ignored by the majority party in the legislative proceedings. Among the results of the 1981–82 legislative reapportionment is that 46.6 percent of the populations of the House districts which primarily encompass Marion and Allen counties, among the state's most populated, are Democrats, or

at least have Democratic voting tendencies. Yet, under the plan adopted in 1981–82, and after the 1982 election, 18 Republicans filled the 21 House seats representing those two counties (and those portions of other counties into which the relevant district lines meander). All were part of multi-member districts. Thus, the Republicans enjoy approximately 86 percent of the House seats apportioned to the populations of Marion and Allen counties, of which 46.6 percent are identifiable as Democratic voters. The Court feels that such a disparity speaks for itself.

## COURT'S ANALYSIS AND CONCLUSIONS OF LAW

■ The Bandemer plaintiffs contend they are entitled to relief under the Equal Protection Clause of the Fourteenth Amendment and provisions of the Indiana Constitution. They challenge the legislature's 1981–82 reapportionment on the grounds that it constitutes political gerrymandering and as such violates the plaintiffs' constitutional rights under the Equal Protection Clause of the Fourteenth Amendment. As such, the plaintiffs' action alleges partisan discrimination under the Fourteenth Amendment. This Court finds that, upon the evidence herein, political gerrymandering did occur and the Bandemer plaintiffs were disadvantaged thereby. Further, the Court finds that the Bandemer plaintiffs are entitled to redress under the Equal Protection Clause of the Fourteenth Amendment.

■ The NAACP plaintiffs allege that the House and Senate redistricting plans intentionally fragment black population concentrations in violation of the Fourteenth and Fifteenth Amendments and perpetuate the effective dilution of black voting strength in violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 (as amended 1982).

In regard to these contentions, the Court has determined that the voting efficacy of the NAACP plaintiffs was impinged upon because of their politics and not because of

their race. It is not in dispute that blacks in this state vote overwhelmingly Democratic. Partisan considerations did motivate the Indiana legislature in the 1981–82 redistricting, as the Court has found. The implementations of those considerations had a significantly adverse impact upon black voters, because they characteristically align themselves to the Democratic party, but not because of their race. Therefore, the Court does not find violations of the Fifteenth Amendment or the Voting Rights Act as argued by the NAACP plaintiffs. Rather, the infirmities which reside in 1981–82 redistricting plan arise under the Fourteenth Amendment's fundamental equal protection guarantee of fair and effective representation. The relief thus ordered below with regard to the Bandemer plaintiffs, as discussed below, also accords to the NAACP plaintiffs that relief to which they are entitled under the facts herein.

The Supreme Court has yet to address directly the constitutional ramifications of a political gerrymander in the context of a state legislative reapportionment. This Court, in so finding a violation of the Fourteenth Amendment, has been persuaded by the analysis of political gerrymandering in Justice Stevens' concurrence in *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983).

By utilizing the analysis in the *Karcher* concurrence, in conjunction with the Court's well-established standard of proof for invidious discrimination as set forth in *City of Mobile v. Bolden*, 446 U.S. 55, 67, 100 S.Ct. 1490, 1499, 64 L.Ed.2d 47 (1980), this Court finds that the 1981–82 state reapportionment invidiously discriminates against the plaintiffs. The plaintiffs' right to vote, as secured by the Equal Protection Clause, is impinged upon by partisan gerrymandering, which constitutes a violation of the Equal Protection Clause under the facts proven herein.

■ The constitutionality of state legislative reapportionments is governed by the Equal Protection Clause of the Fourteenth Amendment, as applied in *Reynolds v.* *Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) and its progeny. As stated by the *Reynolds* Court, "the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds, supra* at 561, 562, 84 S.Ct. at 1381.

*Reynolds* and subsequent cases dealing with state reapportionment have generally arisen out of challenges to the numerical equality of the citizen's right of suffrage. In *Reynolds* the Court enunciated the equal protection test that districts in state reapportionments be "as nearly of equal population as is practicable," *Reynolds, supra* at 577, 84 S.Ct. at 1390. *See Brown v. Thomson*, 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983). Accordingly, the focus of constitutional inquiry has been upon population equality among districts composing an apportionment plan. Deviations from population equality have been the basis in large part for the challenges to state reapportionment plans. Challenges have also been for unconstitutional vote dilution of blacks. *See Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982).

The Bandemer plaintiffs allege that their voting rights as Democrats have been unconstitutionally diluted by the 1981–82 reapportionment. Although no apportionment plan has yet been found unconstitutional because it so discriminated against a political group, the Court has recognized that under the proper facts the Equal Protection Clause accords protection to individuals who are being discriminated against because of their political affiliation, or factors other than race, as each voter is entitled to fair and effective representation. *See Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982); *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

Political gerrymandering has been ·defined as "the deliberate and arbitrary distortion of district boundaries and populations for partisan or personal political purposes", *Karcher* 103 S.Ct. at 2689 (J. Powell dissenting) (quoting *Kirkpatrick v. Preisler*, 394 U.S. 526, 538, 89 S.Ct. 1225, 1232, 22 L.Ed.2d 519 (1969) (Fortas, J. concurring)). Political gerrymandering may be effected by "stacking" individuals of a cognizable political affiliation together in one district or by "cracking" or "splitting" the same among several districts. By either method, the ability of the targeted group to elect representatives according to their proportion of the population is diminished. As such, the constitutional impingement lies not in any inequality among voters per district, but rather in the shapes of the districts as they serve to disadvantage a cognizable class of voters. Thus the configuration of the districts is where attention must be focused, rather than upon the population count therein. (See the Court's description of district shapes at pp. 1486–1488, *supra* and the Court's Exhibit A.) In fact, several Justices have espoused their belief that undue emphasis on numerical equality may permit obvious partisan gerrymandering. *Karcher*, 103 S.Ct. at 2670, 2683, 2688 (Stevens, J. concurring, White, J. dissenting, Powell, J. dissenting, respectively).

The Supreme Court has determined that discriminatory purpose is a required element of a vote-dilution claim under the Equal Protection Clause of the Fourteenth Amendment. In *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), black voters challenged an at-large election system of municipal elections. The plaintiffs' action was based in part on the Fourteenth Amendment. The District Court found the system to be unconstitutional thereunder.

■ The Supreme Court found that a violation of the Fourteenth Amendment had not been established, and in so holding, discussed the level of proof necessary to establish such a claim as racial gerrymandering. "[L]egislative apportionments

could violate the Fourteenth Amendment if their purpose were invidiously to minimize or cancel out the voting potential of racial or ethnic minorities .... To prove such a purpose it is not enough to show that the group allegedly discriminated against has not elected representatives in proportion to its numbers .... A plaintiff must prove that the disputed plan was 'conceived or operated as [a] purposeful devic[e] to further racial ... discrimination ...'" *Mobile v. Bolden*, Id. at 66, 100 S.Ct. at 1499 (1980). (Citation omitted.) Disproportionate effects alone will not establish a claim of unconstitutional vote dilution.

This Court concludes that the same standard applies where political gerrymandering is alleged. The Court finds that the Bandemer plaintiffs have set forth facts sufficient to prove that the reapportionment plan was conceived to accomplish political discrimination and operated as a purposeful device to do so. (See Court's discussion of 1981–82 reapportionment legislative process, at pp. 1483–1484, *supra;* and impact of the redistricting plan on the plaintiffs, pp. 1484–1489, *supra.*) As set forth above, the Court has found that the Bandemer plaintiffs have been disadvantaged by the 1981–82 reapportionment of the Indiana legislature. The effect of the apportionment scheme enacted by the legislature was to dilute the votes of those who are aligned with the Democratic Party, the Bandemer plaintiffs. The Court is thus drawn to the conclusion that in the 1981–82 reapportionment of the Indiana legislative districts, political gerrymandering did occur and as such violated the plaintiffs' rights to equal protection.

■ The right to vote in a fair and effective manner is a fundamental right. The "Equal Protection Clause confers a substantive right to participate in elections on an equal basis with other qualified voters." *Mobile, supra* at 77, 100 S.Ct. at 1505, citing *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S.Ct. 995, 999, 31 L.Ed.2d 274; *Reynolds v. Sims*, 377 U.S. at 576, 84 S.Ct. at 1389. Where political gerrymandering has occurred, this right has been unconsti-

**1492**

tutionally impinged upon. A scheme designed to insure a predestined outcome does not accord to a vote cast that equality in elective power to which it is guaranteed under the Fourteenth Amendment. Each citizen has a right not only to cast a ballot, but to have his political decision be as meaningful as any other vote. Thus political gerrymandering is a violation of the Equal Protection Clause because it invidiously discriminates against a cognizable, identifiable group of voters.

The Supreme Court has "recognized that a voter's right to 'have an equally effective voice' in the election of representatives is impaired where representation is not apportioned substantially on a population basis. In such cases, the votes of persons in more populous districts carry less weight than do those of persons in smaller districts." *Mobile*, 446 U.S. at 78, 100 S.Ct. at 1505. The situation is no less egregious when the votes of persons "carry less weight" because they are cast for a candidate of a particular political party.

■ Political groups themselves do not have an independent constitutional claim to representation. *Mobile*, 446 U.S. at 78, 79, 100 S.Ct. at 1506. That is, the Constitution does not guarantee proportional representation, but the Constitution does prohibit "state action that inhibits an individual's right to vote ....", *Mobile*, 446 U.S. 83, 100 S.Ct. 1508 (Stevens, J. concurring), and certainly, apportionment schemes which purposely inhibit or prevent proportional representation cannot be tolerated.

■ In an action alleging political gerrymandering, as in other gerrymandering situations, the plaintiffs must show a discriminatory purpose in order to prove a violation of the Equal Protection Clause. This Court finds from the evidence that the district lines were drawn with the discriminatory intent to "maximize the voting strength" of the majority Republican Party and "to minimize the strength" of the Democratic Party. (*See Mobile* at 446 U.S. 87, 100 S.Ct. 1510 (Stevens, J. concurring).) The Bandemer plaintiffs have shown that the State has acted with the purpose of

impairing a political group's access to the political process, and therefore a violation of the Equal Protection Clause in the form of political gerrymandering has occurred.

The *Karcher* decision dealt with a challenge to congressional reapportionment. However, in his concurrence Justice Stevens expounded upon the indicia of gerrymandering, be it on a federal or state level. This Court finds the analysis contained therein, which outlines a cause of action for gerrymandering, to be acutely applicable to the present cases.

■ To prove unconstitutional gerrymandering, "plaintiffs must show that they are members of an identifiable political group whose voting strength has been diluted. They must first prove that they belong to a politically salient class, .... one whose geographical distribution is sufficiently ascertainable that it could have been taken into account in drawing district boundaries." *Id.* 103 S.Ct. at 2672 (citation omitted). The Bandemer plaintiffs clearly belong to a politically salient class, those who align themselves with the Democratic Party. Particularly with the computer technology now available, and so utilized by the Republicans in formulating the 1981–82 apportionment plan, the geographical distribution of the Bandemer plaintiffs and the class they represent is ascertainable from the voting records, precinct by precinct, throughout the state. The ability to so determine the distribution of Democratic voters has not been disputed by the defendants.

■ Second, the plaintiffs "must prove that in the relevant district or districts or in the State as a whole, their proportionate voting influence has been adversely affected by the challenged scheme." *Id.* at 2672. Such a "vote dilution may be demonstrated if a population concentration of group members has been fragmented among districts, or if members of the group have been over concentrated in a single district greatly in excess of the percentage needed to elect a candidate of their choice." *Id.* at 2672, fn. 13. The plaintiffs have provided

such evidence, particularly with regard to the House district lines apportioning Marion and Allen counties and other districts throughout the state referred to in our finding of facts. (See Court's discussion at pp. 1485–1486, *supra.*)

■ The third element is that the "plaintiffs must make a *prima facie* showing that raises a rebuttable presumption of discrimination." *Id.* at 2672. Under this element, *prima facie* evidence of gerrymandering can be demonstrated in several ways. One is a showing of numerical inequality, but a violation of numerical equality has not been alleged by the Bandemer plaintiffs. However, the contentions of political gerrymandering and vote dilution which the plaintiffs do raise fall precisely within examples of *prima facie* gerrymandering set forth in the *Karcher* concurrence. Evidence can be in "the shape of the district configuration themselves." *Id.* at 2672. That is, "dramatically irregular shapes may have sufficient probative force to call for an explanation... Substantial divergences from a mathematical standard of compactness may be symptoms of illegitimate gerrymandering." *Id.* at 2672. The present districting plan is replete with "uncouth" and "bizarre" configurations that beg for some rationale, yet the state has set forth none which justifies either the shapes or the concomitant adverse impact upon the plaintiffs. Without some requirement of compactness, no restrictions exist upon the mapmaker to prevent lines which meander in search of partisan support. Further, "[t]o some extent, geographical compactness serves independent values; it facilitates political organization, electoral campaigning, and constituent representation." *Id.* at 2673 (fn. omitted). Therefore "drastic departures from compactness are a signal that something may be amiss." *Id.* at 2674. The lack of compactness in the present plan is clearly supportive of the plaintiffs' argument that partisan considerations are unconstitutionally reflected in the redistricting lines.

Also,
[E]xtensive deviation from established political boundaries is another possible basis for a prima facie showing of gerrymandering. As we wrote in *Reynolds v. Sims,* "Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering." 377 U.S. at 579, 84 S.Ct. at 1390.

*Id.* at 2674.

The reapportionment plan conspicuously ignores traditional political subdivisions, with no concern for any adherence to principles of community interest. (See Court's discussion at pp. 1486–1488, *supra.*) Repeated examples exist of bizarre district configurations, drawn with no recognition or adherence to political subdivisions such as municipalities and counties. The Court has noted before the configurations of House Districts 45 and 46. District 46 encompasses Owen County, two townships in Clay County, four townships in Vigo County and two townships in Sullivan County. The districting tentacle that meanders into Sullivan County engulfs the city of Sullivan, which is the county seat. As a result, the electorate of the county seat is aggregated along with voters from three other counties, into a district that extends from Sullivan, through Clay and Owen Counties and into Morgan County. Concomitantly, the remaining townships of Sullivan County are in District 45, which is drawn south and contains a majority of the townships in Knox County, but not the city of Vincennes. Such is a prime example of how the reapportionment dissects communities into abstract configurations without common threads of political interest.

The Court finds no justifiable reason as to why the voters in the county seat of Sullivan should be excised from the rest of the county and located in a district which is elongated into Morgan County. The distance from the City of Sullivan to the eastern boundary of District 46 in Morgan County is approximately sixty-five miles. While Indiana is by and large a rural state, it does not have vast expanses of area with

sparse population, as is characteristic of some western states. Such distances may be justified there. They are not in Indiana. In the context of Indiana state representation, the Court does not believe that excessive distances and bizarre configurations are mandated by the geographic distribution of the state's population.

The Court does not intend to deemphasize the infirmities of other districts' shapes by elaborating upon the situation in Districts 45 and 46. Several other districts have been discussed earlier in this opinion. (See Court's discussion at pp. 1486–1488). District 62 contains five townships in Daviess County, proceeds north to envelop twelve townships in Green County, south again into Martin and Lawrence Counties and stretches to the southeast corner of Orange County. The distance from the northwest to southeast corners of District 62 is approximately seventy miles. District 66 twists and turns south from Bartholomew County, through Jackson County, across the southwest corner of Jennings County, detours over two townships in Scott County and finally halts in Clark County on the shores of the Ohio River. The same contorted description would be appropriate for districts 70 and 73 as well.

The Court finds that such examples of irrational mapmaking are pervasive throughout the apportionment scheme, rather than isolated events. (See attached Exhibit A and, further, House Districts 20, 22, 25 and 48. Again, the list is not meant to be exhaustive.) Such mapmaking divests the apportionment of the principles of community interest which kindle and nourish fair and effective representation.

To behold the House apportionment map is to view a districting scheme that is skewed against responsive political participation at the county level. While township lines are usually observed, the county government is the center of local affairs. If the county is so disregarded, then the voter does not have a convenient focal point upon which to apply his political activities or to observe the rewards of his efforts. Accordingly the potential for voter disillusion and nonparticipation is great, and the fundamental American principle of self-government is threatened.

The Court recognizes that the principle of "one person, one vote" cannot be subsumed by the undue fostering of "community of interest" principles such as compactness, contiguity and adherence to political subdivision lines. However, the evidence of record does not demonstrate that the district lines as they exist are necessary in order that the "one person, one vote" constitutional tenet be preserved.

■■■■ The inconsistent and unexplained use of multi-member districts further calls for examination by this Court. Multi-member districts are not unconstitutional *per se, Whitcomb v. Chavis,* 403 U.S. 124, 158–159, 91 S.Ct. 1858, 1877, 29 L.Ed.2d 363 (1971), yet their effect of "minimiz[ing] the voting strengths of minority groups by permitting the political majority to elect *all* representatives of the district...." has been recognized by the Court. *Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982). Further, multi-member districts do "violate the Fourteenth Amendment if 'conceived or operated as purposeful devices to further racial ... discrimination' by minimizing, cancelling out or diluting the voting strength of racial elements in the voting population." *Id.* In light of the recent decisions of the Supreme Court discussed above, this Court determines that this proscription applies equally as well to other distinct and identifiable minorities, whether they be political, ethnic, or economic.

The majority party through the use of multi-member districts stacked or split concentrations of black Democratic voters so that their elective power would be minimized. (See Court's discussion of multi-member districts at pp. 1488–1489, *supra.*) This intentional employment of multi-member districts, with their predictable disadvantaging effect upon Democratic voters, is unconstitutional when viewed with the other examples of discriminatory purpose found by this Court.

*Prima facie* evidence may also be shown by a lack of fairness in the procedure surrounding the legislature's enactment of the district lines.

A procedural standard, although obviously less precise, may also be enlightening. If the process for formulating and adopting a plan excluded divergent viewpoints, openly reflected the use of partisan criteria, and provided no explanation of the reasons for selecting one plan over another, it would seem appropriate to conclude that an adversely affected plaintiff group is entitled to have the majority explain its action. On the other hand, if neutral decisionmakers developed the plan on the basis of neutral criteria, if there was an adequate opportunity for the presentation and consideration of differing points of view, and if the guidelines used in selecting a plan were explained, a strong presumption of validity should attach to whatever plan such a process produced.

*Karcher,* 103 S.Ct. at 2674–75.

The challenged plan was the product of the majority party's application of computer technology to the task of mapmaking. The minority party was wholly excluded from the mapmaking process which culminated in the present district lines. Only in the final hours of the legislative session were the details of the plan revealed to the members of the minority party. Minuscule time was available for the plan to be scrutinized, and its import debated. Rather, the minority party was intentionally precluded from participating in the process by which the present plan was drawn up. (See Court's discussion at pp. 1483–1484, *supra.*) Clearly, such a procedure is in degradation of the constitutional norm of fair, effective and equal representation.

Thus, this Court finds that the *Bandemer* plaintiffs have made a *prima facie* showing of discriminatory political gerrymandering in violation of the Equal Protection Clause of the Fourteenth Amendment.

The burden is then upon the State to demonstrate that, notwithstanding the indicia of gerrymander discussed above, the present "plan as a whole embodies acceptable, neutral objectives....", *Id.* at 2675, which negate a finding of constitutional invalidity.

In order to overcome a prima facie case of invalidity, the State may adduce "legitimate considerations incident to the effectuation of a rational state policy," *Reynolds v. Sims, supra,* 377 U.S., at 579, 84 S.Ct., at 1391, and may also

show with some specificity that a particular objective requires the specific deviations in its plan, rather than simply relying on general assertions. The showing ... is flexible, depending on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely. *Ante,* at 2663–2664.

*Id.* at 2675.

The State in this case has been unable to show that the 1981–82 reapportionment is supported by adequate neutral criteria which justifies the adverse impact which the plan has upon the voting rights of the Bandemer plaintiffs. The present plan is without a "rational basis in neutral criteria." *Id.* at 2678.

The Court hereby finds that the Bandemer plaintiffs have been intentionally discriminated against by the Indiana legislature's 1981–82 reapportionment of state legislative districts. The Court makes this finding upon a determination that the Bandemer plaintiffs have shown both discriminatory intent in the enactment of the 1981–82 reapportionment plan and the discriminatory impact of the elective process which has occurred thereunder.

The Court also holds that the remedy ordered below renders moot the Bandemer plaintiffs' allegations that the 1981–82 reapportionment violates Indiana's state constitution.

## ORDER

Having entered the above findings of fact and conclusions of law, this Court:

1. DECLARES and DECREES that the 1981 Indiana House and Senate legislative reapportionment acts and the 1982 amendments thereto are unconstitutional under the Equal Protection Clause of the Fourteenth Amendment.

2. ORDERS that this decision has prospective application only and this Court hereby recognizes that the November 6, 1984 election was legally held and, further, that the 1985 session of the General Assembly and its members are duly constituted under the law.

3. ORDERS that the state officers responsible for implementing the election laws and holding elections thereunder are hereby ENJOINED from holding elections pursuant to the 1981 House and Senate reapportionment acts and 1982 amendments thereto subsequent to the November 6, 1984 general elections.

4. ORDERS that the 1985 session of the Indiana General Assembly is hereby afforded the opportunity to enact legislation to redistrict the State and reapportion the legislative seats in the General Assembly in accordance with federal constitutional requirements and in compliance with this opinion.

5. ORDERS that this Court shall have and retain continuing jurisdiction over the present cases and should the 1985 Indiana General Assembly not enact a reapportionment law which is in compliance with federal constitutional requirements and the Orders of this Court, then this Court shall further act as it is deemed necessary and appropriate under the circumstances then presented to the Court.

PELL, Senior Circuit Judge, concurring in part, dissenting in part.

I concur in the majority's conclusion that defendants, by designing and implementing the present redistricting plan, did not discriminate against NAACP plaintiffs in violation of either the Fifteenth Amendment or section 2 of the Voting Rights Act. I dissent, however, from the majority's decision that defendants violated the Equal Protection Clause of the Fourteenth Amendment by drawing a redistricting plan that diluted Bandemer plaintiffs' and NAACP plaintiffs' voting strength as Democrats. Because I dissent from the majority's determination that defendants' plan constituted an unconstitutional political gerrymander under the Fourteenth Amendment, I must address Bandemer plaintiffs' claims that the plan violated article II, section 1, article I, section 23, and article IV, section 6 of the Indiana Constitution. In my opinion, Bandemer plaintiffs also have failed to prove that defendants violated the Indiana Constitution by adopting this redistricting plan.

### I. NAACP Plaintiffs' Claims

A. Fourteenth and Fifteenth Amendments

I concur in the majority's conclusion that NAACP plaintiffs have failed to prove that defendants, by enacting the present redistricting plan, discriminated against plaintiffs on account of their race. NAACP plaintiffs attack the redistricting plan as unconstitutional under the Fourteenth Amendment, the Fifteenth Amendment, and section 2 of the Voting Rights Act. To demonstrate unconstitutional race discrimination under the Fourteenth and Fifteenth Amendments, plaintiffs must prove that defendants intended to discriminate against them on the basis of race. *Mobile v. Bolden,* 446 U.S. 55, 62–63, 66, 100 S.Ct. 1490, 1497–1498, 1499, 64 L.Ed.2d 47 (1980) (plurality opinion). *See also Gomillion v. Lightfoot,* 364 U.S. 339, 346–47, 81 S.Ct. 125, 129–30, 5 L.Ed.2d 110 (1960) (Fifteenth Amendment challenge to redrawing boundaries of Tuskegee Alabama).

I agree with the majority that the evidence in this case establishes that defendants did not intend to discriminate against plaintiffs on account of their race in drawing the redistricting plan. For this reason, NAACP plaintiffs cannot prove Fourteenth or Fifteenth Amendment claims for race discrimination. If anything, defendants at-

tempted, through their redistricting plan, to maximize Republican voting strength and to contain Democratic voting strength. NAACP plaintiffs, therefore, may argue that defendants discriminated against them on account of their political affiliation in violation of the Equal Protection Clause of the Fourteenth Amendment. I will address that contention in Part II of this opinion.

**B. Section 2 of the Voting Rights Act**

Although I agree with the majority that NAACP plaintiffs have failed to establish that defendants violated section 2 of the Voting Rights Act, I disagree with the reasoning employed by the majority. Despite the fact that the majority found that the redistricting plan "had a significantly adverse impact upon black voters," the majority held that defendants did not violate section 2 because they were motivated by partisan considerations, not racial animus. Unlike claims based upon the Fourteenth and Fifteenth Amendments, a claim based section 2 does not hinge only upon the presence of discriminatory intent. For that reason, a court should not dispose of a section 2 claim simply because it finds no Fourteenth or Fifteenth Amendment violations.

In 1982, Congress amended section 2 of the Voting Rights Act to eliminate the necessity of establishing discriminatory intent to prove a violation of that section. 42 U.S.C. § 1973 (1982). To prove a violation under section 2 as amended, plaintiffs must demonstrate either that defendants intended to discriminate against them or that "the [challenged] structure or practice *results* in a dilution of minority voting power." *Major v. Treen*, 574 F.Supp. 325, 350 (E.D.La.1983) (emphasis in original). *See also Ketchum v. Byrne*, 740 F.2d 1398, 1403, 1404 (7th Cir.1984), *petition for cert. filed*, — U.S. —, 105 S.Ct. 501, 83 L.Ed.2d 393 (1984). To determine whether plaintiffs have suffered vote dilution under the redistricting plan, the court should examine "the totality of the circumstances." 42 U.S.C. § 1973(b) (1982).

In its report accompanying the 1982 amendments, the Senate Judiciary Committee set forth seven factors that a court should consider to decide whether defendants have violated section 2. S.Rep. No. 417, 97th Cong., 2d Sess. 28–29 *reprinted in* 1982 U.S.Code Cong. & Ad.News 206–07. The application of these factors to the facts in this case supports defendants' position that they did not violate section 2 by adopting the redistricting plan. According to the Report, the court should first consider "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." *Id.* While plaintiffs correctly pointed out that the state historically has discriminated against blacks in areas of public accommodation, education, and housing, they do not offer evidence to show that blacks suffered discrimination in voting matters.

Second, the court should examine whether, if at all, racial polarization has tainted the voting in Indiana elections. The United States Supreme Court has acknowledged the importance of this factor: "Voting along racial lines allows those elected to ignore black interests without fear of political consequences, and without bloc voting the minority candidates would not lose elections solely because of their race." *Rogers v. Lodge,* 458 U.S. 613, 623, 102 S.Ct. 3272, 3279, 83 L.Ed.2d 393 (1982). As defendants emphasize in their briefs, no evidence exists to demonstrate that racial polarization has marred Indiana elections. In fact, in 1982, voters from white-majority House districts elected two black candidates to the Indiana House. Additionally, in the same election, voters from a black-majority district elected a white candidate to the House.

The court should examine as a third possible indication of vote dilution "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance that opportu-

nity for discrimination against the minority group." S.Rep. No. 417, U.S.Code Cong. & Admin.News .1982, p. 206. Plaintiffs have not demonstrated the existence of any of these enumerated devices that could minimize black voting strength. Nonetheless, plaintiffs challenge defendants' retention of multi-member districts within the redistricting plan as racially discriminatory. The majority stated that defendants' use of multi-member districts adversely affected black voters in Indiana, emphasizing the fact that, while only 39% of the total population resided in multi-member districts, 81.2% of the black population resided in multi-member districts. Addressing this comparison, defendants' expert, Dr. Bernard Grofman, pointed out that

> [t]he proportion of blacks in multi-member districts is, in and of itself, no indication of anything. The relevant question is what proportion of the districts are majority black districts in the relevant geographic areas of the state, as compared to the proportions of blacks in those areas of the state.

Comparing the proportion of black-majority multi-member districts with the percentage of blacks living in those districts, I find that defendants did not violate section 2 by including multi-member districts within the redistricting plan.

Plaintiffs challenge defendants' use of multi-member districts in Allen and Marion Counties, in particular, as discriminatory against blacks. In Allen County, which defendants divided into two three-member districts, blacks comprise approximately 8% of the population. Assuming voting along racial lines, the black population's inability to elect any Representatives in Allen County does not demonstrate vote dilution. Even if blacks were entitled to proportional representation, *but see Jones v. City of Lubbock*, 727 F.2d 364, 384 (5th Cir.1984); *Terrazas v. Clements*, 581 F.Supp. 1329, 1356 (N.D.Tex.1984), because they com-

prise only 8% of the population, they would not be entitled to even one of the six seats in Allen County.

Similarly, defendants have not diluted. black voting strength in Marion County through the adoption of the five three-member districts that compose the county. Blacks constitute approximately 19% of the population in Marion County. The present redistricting plan enables blacks to elect three Representatives by creating one three-member district with a 61.2% black population.[1] Thus, blacks are able to elect 20% of the Marion County Representatives. By retaining multi-member districts in Marion County, defendants have not diluted the black voting strength, but have, in fact, guaranteed blacks slightly greater than proportional representation.

The fact that blacks possess near proportional representation in Lake County also supports defendants' position that they have not violated section 2. According to plaintiffs' figures, blacks constitute 24% of the population in Lake County. Under the present plan, blacks constitute a majority in District 14, a two-member district. If defendants had drawn a plan that permitted blacks to elect three Representatives from Lake County, blacks would have been able to capture 25% of the Lake County seats. Defendants' failure to accord blacks this slight overrepresentation can be explained by the position of Lake County within the seven districts that encompass it. Only five of the districts are composed entirely of Lake County residents. In the remaining two districts, Lake County residents make up only small portions of those districts. More particularly, in District 10, a two-member district, blacks constitute only .3% of the total population. Similarly, in District 16, a single-member district, blacks constitute only .1% of the total population. Under these circumstances, the black population's ability to elect approxi-

---

**1.** In *Ketchum v. Byrne*, the Seventh Circuit noted that "minorities must have something more than a mere majority even of voting age population in order to have a reasonable opportunity to elect a representative of their choice." 740

F.2d at 1413. The fact that, in 1982, two of the three Representatives elected to the House from the black-majority district were black indicates that blacks possessed considerable voting strength in that district.

mately 17% of the Representatives from all the districts that include Lake County leads me to conclude that defendants have not diluted black voting strength in Lake County.

A court should measure vote dilution by analyzing the effects of redistricting in those areas that contain majorities of the minority population. According to a recent case that addressed the issue of vote dilution under section 2 of the Voting Rights Act:

> the raw power of such an aggregation 'to elect' provides a clear measure of its voting strength, hence a fair and workable standard by which to measure dilution of that strength. Short of that level, there is no such principled basis for gauging voting strength, hence dilution of that strength.

*Gingles v. Edmisten*, 590 F.Supp. 345, 381 (E.D.N.C.1984). Thus, the black community's inability to exercise effective voting power in those areas in which they comprise voting majorities may indicate vote dilution. In this case, however, a comparison of the percentage of blacks with the number of black majority districts in Marion and Lake Counties demonstrate that defendants have not diluted the black vote through the redistricting plan.

The majority asserts that defendants' use of multi-member districts is "particularly effective in 'stacking' blacks into large majority districts and fragmenting their population among other districts." I disagree with this conclusion. In Marion County, defendants have drawn District 51 to contain a 61.2% black population. To ensure effective black voting power, defendants had to construct that district to include at least a majority of the black population, and perhaps a super-majority. *See Ketchum*, 740 F.2d at 1413. Even if defendants had placed all of the other blacks into one district, they could not have constructed another black-majority district. Under these circumstances, defendants did not stack black votes in Marion County.

Similarly, I cannot find that defendants "packed" the black vote in Lake County, the other county containing a black-majority district. If defendants had drawn District 14 to contain a 51% black majority, rather than the 69.9% majority that exists in that district under the plan, defendants conceivably could have placed the rest of the black population in the remaining districts in such a way as to create another black majority district. *But see Major v. Treen*, 574 F.Supp. 325, 354 (E.D.La.1983) ("[W]e are not unmindful of the legitimate debate among academics and courts about the relative merits of concentrating a minority population within one district or dividing that population into two or more districts so that it exerts a substantial influence in each."). Undoubtedly, because seven districts compose Lake County, and because Lake County houses a total population of over one-half million people, defendants would have been hard-pressed to construct another majority district while still making the districts compact and contiguous. Additionally, as discussed previously, the present plan ensures near proportional representation for the black community in Lake County. Defendants should not be faulted for designing a plan that should guarantee that two representatives will be elected from a black-majority district; if defendants had drawn even one more black-majority district, they would have enabled blacks to wield voting strength greater than their percentage within the community would suggest. Certainly, a court should not obligate legislators to overrepresent the voting strength of a particular minority within the community. *See Gingles v. Edmisten*, 590 F.Supp. 345, 382 (E.D.N.C.1984).

I cannot agree, either, with the majority's assertion that defendants used multi-member districts to fragment black voting strength. In Lake County, of the 8% to 9% black population that exists outside District 14, defendants have arranged it among the remaining districts so that one district contains a 30.6% black population and another contains a 13.3% black population. These figures do not suggest that fragmentation of the black vote exists in Lake County.

Similarly, in Marion County, of the 8% to 9% black population that exists outside District 51, defendants have constructed one of the remaining four districts to contain a 21.6% black population. Again, defendants have not fragmented the black vote among the districts in Marion County.

Plaintiffs also have failed to demonstrate that any of the final four factors listed in the Senate Report indicates that defendants violated section 2 by adopting the redistricting plan. Plaintiffs have not proven that blacks have been denied access to the candidate slating process, S.Rep. No. 417; rather, defendants have offered evidence to show that blacks hold positions of leadership within both major political parties. Additionally, plaintiffs have failed to prove that blacks "bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process." Id. To the contrary, defendants have shown that blacks involve themselves both within the parties' structures and within the elected government. Also, plaintiffs have tendered no evidence to suggest that Indiana elections have been marked by "overt or subtle racial appeals." Id. Lastly, defendants have shown that blacks "have been elected to public office" in Indiana, id.; in fact, more blacks now hold seats in the Indiana General Assembly than before the adoption of the redistricting plan.

Analyzing the factors set out in the Senate Judiciary Committee's Report, I find that plaintiffs have failed to prove that defendants diluted the black voting strength in Indiana. Furthermore, defendants have established that the redistricting plan resulted in no "retrogression" of the black vote. As the Seventh Circuit stated in Ketchum v. Byrne, " 'Retrogression' may be defined as a decrease in the new districting plan or other voting scheme from the previous plan or scheme in the absolute number of Representatives which a minority group has a fair chance to elect." 740 F.2d at 1402 n. 2. For purposes of this case, retrogression would occur if defendants reduced the number of black majority districts that exist under the present redistricting plan from the number of black majority districts that existed under the previous redistricting plan. Defendants preserved both the two black-majority Senate districts and the two black-majority House districts in their redistricting plan. Thus, defendants' plan did not cause any retrogression of the black vote.

In conclusion, I agree with the majority's determination that defendants did not violate section 2 of the Voting Rights Act by adopting the present redistricting plan. As the majority notes, plaintiffs have failed to prove that defendants intended to discriminate against them on account of their race. Plaintiffs also have failed to establish that the redistricting plan resulted in a dilution of their voting strength.

## II. Bandemer Plaintiffs' Claims

### A. Political Gerrymandering under the Equal Protection Clause

The Supreme Court of the United States never has addressed directly the justiciability of a political gerrymandering claim. Nonetheless, five Justices have expressed a willingness to analyze such claims under the Equal Protection Clause of the Fourteenth Amendment. Karcher v. Daggett, 462 U.S. 725, 744, 775, 103 S.Ct. 2653, 2667, 2683, 77 L.Ed.2d 133 (1983) (Stevens, J., concurring) (White, J., dissenting, joined by Burger, C.J., Powell, J., and Rehnquist, J.). Because I believe that the facts of this case do not demonstrate a political gerrymander, I do not reach the constitutional question whether a cause of action for political gerrymandering exists under the Equal Protection Clause.

According to Justice Stevens, "political gerrymandering is one species of 'vote dilution' that is proscribed by the Equal Protection Clause." 103 S.Ct. at 2667 (Stevens, J., concurring). To shift the burden of proof to defendants to justify the redistricting plan, plaintiffs first must prove that the plan diminishes the voting strength of an identifiable political group within the

state.[2]  *Id.* at 2672 (Stevens, J., concurring).  Specifically, plaintiffs

> must first prove that they belong to a politically salient class.... Second, they must prove that in the relevant district or districts or in the State as a whole, their proportionate voting influence has been adversely affected by the challenged scheme.  Third, plaintiffs must make a prima facie showing that raises a rebuttable presumption of discrimination.

*Id.* (Stevens, J., concurring).  Defendants must justify the adoption of the redistricting plan as serving "neutral, legitimate interests" of the state only if the plaintiffs first can prove the existence of the three elements that Justice Stevens sets forth.

Plaintiffs have failed to prove that this redistricting plan constitutes an unconstitutional gerrymander because they have failed to prove that the plan has diluted their voting strength ˌas Democrats.  As the majority points out, plaintiffs have offered statistical data that, according to plaintiffs, proves that their voting strength has been minimized.  Of this data, the majority emphasizes two numerical comparisons to prove vote dilution.  First, plaintiffs point out that, although Democratic candidates for the Indiana House received 51.9% of the vote statewide in 1982, only 43 Democrats were elected to the available 100 seats.  Second, plaintiffs point out that although Democratic candidates for the Indiana Senate received 53.1% of the vote statewide, only 13 Democrats were elected to the available 25 seats.[3]

Unlike the majority, which finds that these figures "signal" Democratic vote dilution, I find that a comparison between the percentage of Democratic votes cast statewide for legislative candidates and the number of seats actually won, standing

alone, fails to prove vote dilution.  According to authorities that Justice Stevens cited approvingly in *Karcher*, 103 S.Ct. 2672 n. 13,

> This method of identifying gerrymandering ... has major flaws.... [T]he approach fails to account for the fact that the difference between the percentage of votes and number of seats captured may in fact be the result of natural advantages—the inordinate concentration of partisans in one place—rather than any deliberate partisan districting scheme.

Backstrom, Robins & Eller, Issues in Gerrymandering: An Exploratory Measure of Partisan Gerrymandering Applied to Minnesota, 62 Minn.L.Rev. 1121, 1127 (1978).  To measure the pure voting strength of a particular party within the state, these authors suggest isolating "typical" statewide races, those concerning "relatively invisible offices," and determining the percentage of votes cast for each candidate in these races.  *Id.* at 1131.  These "typical" races more accurately reflect partisan voting strength because their outcome depends, more often than not, on straight party affiliation rather than on the personalities of the particular candidates.  *Id.*

Comparing the number of seats gained by the Democrats in the Senate and House elections with the base voting strength of the Democrats statewide, I find that plaintiffs have not demonstrated that they have suffered vote dilution under the redistricting plan.  To minimize the controversy over which typical race to use, the authors suggest adopting "an average of several statewide partisan races from recent elections."  *Id.*  In 1982, in the race for State Auditor, the Democratic candidate received 50.8% of the vote.  In the election for Clerk of the Supreme Court and Court of Ap-

---

**2.** Although the four dissenters do not delineate the framework within which they would analyze a political gerrymandering claim, Justice Powell intimates that he would require greater proof than minimization of voting strength to establish a political gerrymandering claim.  According to Justice Powell, a redistricting plan rises to the level of an unconstitutional gerrymander only if its "purpose and effect [are] *substantially* [to] disenfranchis[e] identifiable groups of voters."  103 S.Ct. 2689 (Powell, J., dissenting) (emphasis added).

**3.** As these numbers indicate, the percentage of seats actually won by the Democrats in the Senate is 52%, approximately the number to which they were entitled under plaintiffs' theory.

peals, the Democratic candidate received 48.7% of the vote. In 1980, the Democratic candidate for the office of Reporter of the Supreme Court and Court of Appeals won 43.9% of the vote.[4] Averaging the 1980 results with the average of the 1982 races yields 46.8% as the measure of the Democratic voting strength statewide in Indiana.

Under a comparison of the Democratic voting strength statewide and the percentage of Democratic seats captured in the House and Senate, plaintiffs have failed to demonstrate vote dilution. Although the Democrats won fewer House seats than the base voting strength suggested, they won considerably more seats in the Senate. Compared with a base percentage of 46.8%, the Democrats won 43% of the House seats in 1982. In the Senate elections, however, they won 52% of the seats. Thus, even if the purpose behind the plan was to favor the Republicans, the result of the plan was to advantage and disadvantage both parties equally under the plan.

Most likely, under these circumstances, factors other than political gerrymandering caused the House and Senate race results to be skewed in relation to the base Democratic voting strength statewide. The personality of the particular candidates and the specific political issues of the day may explain the small disparity between percentages. Certainly, the personality of a candidate for the Indiana House or Senate bears more heavily on the outcome than does the personality of a candidate for a relatively invisible office. In fact, Bandemer plaintiffs, in their reply brief, cited instances where both Democratic and Republican candidates ran ahead of the base vote and overcame the political complexion of their districts. Also, the heavy concentration of Democratic voters in urban areas may account for the discrepancy between the base vote and the seats won in the House elections. In these districts, any Democratic votes in excess of the number needed to elect the candidate will be politi-

cally ineffectual. Nonetheless, these votes will be influential in the statewide races from which the Democratic base vote derives. Under the facts of this case, I disagree with the majority's conclusion that plaintiffs have demonstrated unconstitutional political gerrymandering. I would hold that plaintiffs have failed to satisfy the heavy burden of proving vote dilution. *Karcher*, 103 S.Ct. at 2672 (Stevens, J., concurring) ("[T]his is a burden that plaintiffs can meet in relatively few cases.").

The presence of multi-member districts in the redistricting plan does not convert a legitimate plan into an unconstitutional gerrymander. The Supreme Court has noted frequently that multi-member districts are not *per se* unconstitutional. *Rogers v. Lodge*, 458 U.S. 613, 617, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982); *Chapman v. Meier*, 420 U.S. 1, 15, 95 S.Ct. 751, 760, 42 L.Ed.2d 766 (1975); *White v. Regester*, 412 U.S. 755, 765–66, 93 S.Ct. 2332, 2339–40, 37 L.Ed.2d 314 (1973); *Reynolds v. Sims*, 377 U.S. 533, 577, 84 S.Ct. 1362, 1389, 12 L.Ed.2d 506 (1964). In fact, single-member districts may be drawn to discriminate against an identifiable political group just as easily as multi-member districts.

According to the Supreme Court, to prove that multi-member districts deprive an identifiable political group of equal protection:

[T]here must be more evidence than a simple disproportionality between the voting potential and the legislative seats won by a racial or political group. There must be evidence that the group has been denied access to the political process equal to the access of other groups.

*Chapman*, 420 U.S. at 17, 95 S.Ct. at 761. Thus, the fact that Democrats gained only 20% of the House seats in Marion County in 1982 does not prove that defendants unconstitutionally employed multi-member districts in Marion County. In fact, defendants have offered into evidence the certified election returns for Marion Coun-

---

**4.** That this election occurred under a former redistricting plan does not affect its relevance to this calculation. The manner in which a state is

districted has no bearing on the way in which votes are cast in a statewide election.

ty for the State Auditor's race to demonstrate that the base Democratic voting strength in Marion County was considerably less than their strength statewide.[5]

. The Supreme Court has enumerated three factors as demonstrative of a denial of access to the political process. First, the court should determine the predominance of multi-member districts within the redistricting scheme. Here, of a total of seventy-seven House districts, the legislature has drawn only nine two-member districts and seven three-member districts. The fact that 20% of the districts are multi-member and that 39% of the Representatives come from these districts does not demonstrate that "multi-member districts compose a large part of the legislature." *Id.* Second, the presence of multi-member districts within both the House and the Senate plans may indicate that the multi-member districts are designed to deny a particular political group access to the political process. *Id.* Here, following past practice, the Senate plan contains no multi-member districts. Third, the court should consider whether the plan allows candidates to run from the same subdivisions of a particular district or whether it imposes some type of residency requirement. *Id.* Neither party has offered any evidence that bears on this issue. ·

According to the majority, the redistricting plan unconstitutionally dilutes Democratic voting strength because, among other things, the multi-member districts stack Democratic voters. In other words, the majority finds that Democrats "have been overconcentrated in single district[s] greatly in excess of the percentage needed to elect candidate[s] of their choice." *Karcher*, 103 S.Ct. at 2672 n. 13 (Stevens, J., concurring). If defendants can be faulted for overconcentrating Democrats in multi-member districts, they can be faulted equally for stacking Republicans in single-member districts. In the 1982 House elections, Republicans won twenty-seven contested elections in single-member districts. Of these twenty-seven elections, Republicans won two races with over 65% of the vote, eight races with over 60% of the vote, and twelve races with over 55% of the vote. Certainly, these statistics indicate that defendants placed Republicans in single-member districts in excess of the pure majority needed to exercise . effective voting strength. ·

Defendants did not deny equal protection to Democrats by retaining multi-member districts within the redistricting plan, but they demonstrated a willingness to convert multi-member districts into single-member districts. Under the present redistricting plan, there are four fewer two-member districts than under the previous plan. According to defendants, the legislators changed multi-member districts into single-member districts in those districts in which all the Representatives requested such a change. This fact, coupled with the absence of vote dilution either within the multi-member districts themselves or within the state as a whole, demonstrates that defendants have not violated plaintiffs' equal protection rights by retaining multi-member districts in the House redistricting plan.

Defendants adhered to "neutral, legitimate interests" in enacting the present redistricting plan. *Karcher*, 103 S.Ct. at 2670 (Stevens, J., concurring). They adhered to the "one-man one-vote" principle contained in article I, section 2 of the United States Constitution by formulating a House plan with a population deviation of only 1.05% and a Senate plan with a population deviation of 1.33%. These minor deviations clearly pass muster under article I, section 2. *Brown v. Thomson*, 462 U.S. 835, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214 (1983) ("Our decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations."). In addition to avoid-

---

**5.** In Marion County, the Democratic candidate for State Auditor received only 39% of the vote in 1982.

ing dilution of the Democratic vote, defendants prevented any retrogression in the black voting strength in Indiana by maintaining all districts which had been black-majority districts under the former plan. Finally, by adopting the plan, defendants advanced subsidiary objectives that the Supreme Court has sanctioned as permissible state interests. First, defendants protected incumbents by drawing a plan which avoided placing them in the same district. *Burns v. Richardson*, 384 U.S. 73, 89 n. 16, 86 S.Ct. 1286, 1295 n. 16, 16 L.Ed.2d 376 (1966). *See also Karcher*, 103 S.Ct. at 2663. Second, defendants preserved the integrity of political subdivisions within the redistricting plan, which also constitutes a legitimate state interest. *Mahan v. Howell*, 410 U.S. 315, 328, 93 S.Ct. 979, 987, 35 L.Ed.2d 320 (1973), *modified*, 411 U.S. 922, 93 S.Ct. 1475, 36 L.Ed.2d 316. *See also Karcher*, 103 S.Ct. at 2663. In this plan, as the majority points out, defendants preserved township lines in most cases.

Although the Supreme Court has recognized that the Constitution places limits upon the legislature's freedom to enact any redistricting plan, the Court has emphasized that redistricting remains essentially a political task. *Gaffney v. Cummings*, 412 U.S. 735, 749, 93 S.Ct. 2321, 2329, 37 L.Ed.2d 298 (1973). *See also Karcher*, 103 S.Ct. at 2671-72 (Stevens, J., concurring); *id.* at 2689 (Powell, J., dissenting). As the Supreme Court stated in *Gaffney*, "From the very outset, we recognized that the apportionment task, dealing as it must with fundamental 'choices about the nature of representation,' *Burns v. Richardson*, 384 U.S. at 92, [86 S.Ct. at 1297], is primarily a political and legislative process." 412 U.S. at 749, 93 S.Ct. at 2329. In his concurrence in *Karcher*, Justice Stevens recognized that the determination whether a redistricting plan constitutes political gerrymandering must turn primarily upon the actual effect of the plan and not upon the intent of the legislators:

> I would not condemn a legislature's districting plan in the absence of discriminatory impact simply because its proponents were motivated, in part, by parti-

sanship or group animus. Legislators are, after all, politicians; it is unrealistic to attempt to proscribe all political considerations in the essentially political process of redistricting.

*Karcher*, 103 S.Ct. at 2671-72 (Stevens, J., concurring). In this case, because Bandemer plaintiffs have failed to prove that, as Democrats, they suffered any actual vote dilution under the redistricting plan, I find that defendants have not violated the Equal Protection Clause of the Fourteenth Amendment. Under these circumstances, the judiciary should not be concerned with whether another conceivable plan might maximize a group's voting strength. Rather, in cases such as this, the court should defer to the legislature and affirm its constitutional redistricting plan. *Wise v. Lipscomb*, 437 U.S. 535, 539, 98 S.Ct. 2493, 2496, 57 L.Ed.2d 411 (1978) (White, J., announcing the judgment of the court in an opinion joined by Stewart, J.) ("[R]edistricting and reapportioning legislative bodies is a legislative task which the federal courts should make every effort not to preempt.").

**B. Political Gerrymandering under the Indiana Constitution**

Plaintiffs' inability to prove vote dilution under the redistricting plan also disposes of their claims under article II, section 1 and article I, section 23 of the Indiana Constitution. Article II, section 1 provides that "All elections shall be free and equal."

According to the Indiana Supreme Court, this provision means that "the vote of every elector is equal in its influence upon the result to the vote of every other elector." *Blue v. State ex rel. Brown*, 206 Ind. 98, 114, 188 N.E. 583, 589 (1934). *Accord State Election Board v. Bartolomei*, 434 N.E.2d 74, 78 (Ind.1982); *Oviatt v. Behme*, 238 Ind. 69, 75, 147 N.E.2d 897, 900-901 (1958). Because defendants have maintained population equality between districts and have not diluted the Democratic voting strength, they have complied with article II, section 1 of the Indiana Constitution.

Article 1, section 23 provides: "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens." This equal protection clause of the Indiana Constitution protects the same rights as the federal Equal Protection Clause. *Reilly v. Robertson,* 266 Ind. 29, 37, 360 N.E.2d 171, 175 (1977), *cert. denied,* 434 U.S. 825, 98 S.Ct. 73, 54 L.Ed.2d 83; *Haas v. South Bend Community School Corp.,* 259 Ind. 515, 526, 289 N.E.2d 495, 501 (1972). Naturally, as with the federal Constitution, the Indiana Constitution does not entitle every voter to the representative of his or her choice. Addressing this issue, the United States Supreme Court stated:

> [T]ypical American legislative elections are district-oriented, head-on races between candidates of two or more parties. As our system has it, one candidate wins, the others lose.... [A]rguably [the losing candidates' supporters] have been denied equal protection of the laws since they have no legislative voice of their own.... But we have not yet deemed it a denial of equal protection to deny legislative seats to losing candidates, even in those so-called 'safe' districts where the same party wins year after year.

*Whitcomb v. Chavis,* 403 U.S. 124, 153, 91 S.Ct. 1858, 1874, 29 L.Ed.2d 363 (1971). Rather, the equal protection clause of the Indiana Constitution, like the Fourteenth Amendment of the federal Constitution, guarantees to each voter the right not to have his vote diluted under a redistricting plan. Defendants have not violated article I, section 23 of the Indiana Constitution in this case.

Bandemer plaintiffs challenge the constitutionality of the redistricting plan on one additional ground. They argue that the plan violates article IV, section 6 of the Indiana Constitution, which states: "A Senatorial or Representative District, where more than one county shall constitute a district, shall be composed of contiguous counties; and no county, for Senatorial apportionment, shall ever be divided."[6] The redistricting plan satisfies the first clause mandating that counties be contiguous in districts composed of more than one county. Concededly, the redistricting plan violates the second clause prohibiting a division of counties within the Senate redistricting plan. Nonetheless, the legislators presumably could not satisfy this clause and comport with the Supreme Court's requirement of substantial population equality within districts. After all, the legislators sought to apportion Indiana's 92 counties into only 50 districts, representing the 50 seats in the Indiana Senate. To accomplish this apportionment while still complying with the one-man one-vote requirement, the legislature inescapably divided counties. In *Whitcomb v. Chavis,* the United States Supreme Court recognized the unavoidability of a conflict between article IV, section 6 of the Indiana Constitution and article I, section 2 of the United States Constitution. 403 U.S. 125, 162 n. 42, 91 S.Ct. 1879 n. 42 (plurality opinion). The Court affirmed a district court's redistricting plan for Indiana that split the counties 90 times. *Id.*

Although the redistricting plan may contravene the literal meaning of article IV, section 6, it does not undermine the original purpose behind the second clause of section 6. This clause, according to the Indiana Supreme Court, was enacted to promote proportional popular representation. *Denney v. State ex rel. Basler,* 144 Ind. 503, 519, 42 N.E. 929, 934 (1895). The present one-man one-vote requirement, however, advances that aim to an even greater degree. Thus, I conclude that defendants' Senate redistricting plan, which splits counties seventy-three times, does not violate article IV, section 6 of the Indiana Constitution because it embodies an attempt to apportion 92 counties into 50 district while still retaining population equality among districts.

---

**6.** 1982 Ind.Acts 232, § 4, as concurred in by 1984 Ind.Acts 219, § 3, repeals this section.

This repeal was passed by the voters at the November 1984 general election.

### III. Conclusion

I concur in the majority's decision that defendants have not discriminated against NAACP plaintiffs on account of their race in violation of either the Fifteenth Amendment or section 2 of the Voting Rights Act.

I dissent, however, from that part of the majority's decision that holds that defendants discriminated against NAACP and Bandemer plaintiffs as Democrats in violation of the Equal Protection Clause of the Fourteenth Amendment.

COURT EXHIBIT A

## 1982 INDIANA HOUSE DISTRICTS

**MULTI-MEMBER**

**DISTRICTS**

7 (2)

9 (2)

10 (2)

11 (2)

12 (2)

14 (2)

15 (2)

19 (3)

20 (3)

31 (2)

48 (3)

49 (3)

50 (3)

51 (3)

52 (3)

75 (2)

1508

INDIANA
STATE
SENATE
1981