G.   Mae DICKINSON, et al., Plaintiffs,

v.

The INDIANA STATE ELECTION BOARD, et al., Defendants.

No. IP 90–200–C.

United States District Court, S.D. Indiana, Indianapolis Division.

June 27, 1990.

Stephen Laudig, Indianapolis, William R. Groth, Fillenwarth Dennerline Groth & Baird, Indianapolis, Richard J. Swanson, Segal and Macey, Indianapolis, for plaintiffs.

Alan K. Mills, Barnes & Thornburg, Indianapolis, for state defendants.

William M. Evans, Bose McKinney & Evans, Indianapolis, for Rule 19 defendants.

## ENTRY AND ORDER

McKINNEY, District Judge.

This cause is before the Court for a determination of whether principles of eq-

uity or the doctrine of laches bar the plaintiffs' claim. The plaintiffs brought 'this action pursuant to § 2 et seq. of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 et seq., alleging the 1981 reapportionment of Indiana by the Indiana General Assembly, establishing Districts 49 and 51, was the product of racial gerrymandering.

The parties have submitted briefs to this Court citing numerous decisions that discuss equity and laches. These cases reveal that courts faced with these issues have not reached uniform results. Before discussing these cases and today's holding, however, it is necessary to set forth a brief factual background of this case. With this outline established, the Court first will comment on the presence and absence of certain parties in this suit. Next, the relevant voting rights case law will be discussed. Finally, key principles will be extracted from these cases and applied to the facts at bar in resolving this matter.

## I. FACTUAL BACKGROUND

This action was commenced March 2, 1990. Due to time constraints created by the upcoming November elections, and the seriousness which cloaks allegations of vot-

ing discrimination, this cause has been given priority on this Court's docket.[1]

The plaintiffs in this cause are registered voters from Marion County, some of whom are candidates for the Indiana House of Representatives from Districts 49 and 51.[2] The defendants fall into two categories. In one category is the Indiana State Election Board ("Board"), Indiana Gov. Evan Bayh, Alan K. Mills, and Donald B. Cox. ("State defendants"). Bayh is named in his official capacity as governor and as an *ex officio* member of the Board. Mills and Cox are named in their official capacities as Board members.[3] Though named as defendants, the State defendants interests' in reality are more closely aligned with the plaintiffs' interests. The implications of this fact are discussed herein.

In the other category are defendants Paul S. Mannweiler, John S. Keeler, and John C. Ruckelshaus III ("Rule 19 defendants"). These defendants are candidates for State Representative in House District 49 and were named in this action as defendants pursuant to Rule 19(a)(2) of the Federal Rules of Civil Procedure. It is these defendants who have raised the issue of whether this action should be dismissed based on principles of equity or laches,[4]

1. This cause was transferred between two other district court judges before being docketed here. This Court already has issued several decisions in this case. Among them is an Order of April 18, 1990, denying a three-judge court, and an Order of May 17, 1990, denying a motion to strike the complaint and denying sanctions.

2. For example, plaintiff G. Mae Dickinson is a candidate from District 49. Several other plaintiffs in this cause originally were named as defendants, but were realigned as plaintiffs pursuant to this Court's Order of April 27, 1990.

3. Mills filed an appearance in this cause March 30, 1990, on behalf of the State defendants.

4. The Court originally questioned *sua sponte* whether dismissal was required for these reasons, and set this matter for oral argument. (*See* Order of April 17, 1990.) The Rule 19 defendants did not attend this argument, later informing this Court that they did not receive notice of this hearing. The State defendants attended the hearing but informed the Court that they had no desire to raise equity or laches as a defense. (*See* Order of May 30, 1990.) In fact, the State defendants informed the Court that they felt the relief requested in the com-

plaint should be granted. Subsequently, the Rule 19 defendants raised equity and laches as affirmative defenses, and the Court Ordered briefing on the issue. The Rule 19 defendants have asked that their brief, to the extent necessary, be deemed a Rule 12(b)(6) motion to dismiss. However, the plaintiffs and the Rule 19 defendants each submitted an affidavit regarding this motion.

The submission of affidavits in conjunction with a motion to dismiss under Rule 12(b)(6) normally converts the motion into one for summary judgment. *Mac's Eggs, Inc. v. Rite–Way Agri Distributors,* 656 F.Supp. 720, 727–28 (N.D. Ind.1986); *see also* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1366 at 675 (1969) (*"Wright & Miller"*). The parties were informed at a pretrial conference of this Court's intent to treat the defendants' motion as a summary judgment motion, and declined the opportunity to submit additional affidavits or other evidence on this matter. Thus, the requirements of Rule 12(b)(6) that, upon treating a motion to dismiss with affidavits as one for summary judgment, the parties shall be given reasonable opportunity to present additional, pertinent material, have been satisfied in this

and without whom the necessary "case or controversy" element would be missing from this litigation.

Districts 49 and 51 are three-member districts from which state representatives are elected on an at-large basis. The districts are split north-south by an occasionally irregular boundary along 38th Street in Marion County. The southern boundary of District 49 serves as the northern boundary of District 51. According to 1980 census figures, on which the plaintiffs' complaint is based, District 49 is predominately white (78%), and District 51 is predominately black (61.2%). The majority racial group in each district has consistently elected candidates of its choice to the House.

The plaintiffs allege that Districts 49 and 51 are split along 38th Street in such a way that black voters are packed into the predominately black District 51 and submerged into the predominately white District 49, thus diluting blacks' voting strength. To remedy this situation, the plaintiffs propose that this Court create a new single-member district. The proposed district would be created, in part, by "trading" 10 precincts in District 49 south of 38th Street with nine precincts in District 51 north of 38th Street. The plaintiffs assert that black voters in the proposed district are sufficiently numerous and geographically compact to constitute a majority in a single-member distrct.

The Rule 19 defendants assert this action is barred by principles of equity and the doctrine of laches. As for the equity argument, these defendants argue that granting remedial action is unwise for many reasons, including the cost, confusion, and general disruption of the election process that would result if this Court were to interfere in the rapidly approaching elections. In support of this contention, the Rule 19 defendants note that primary elections are completed, campaigns are underway, and the election machinery is in gear. Moreover, the defendants emphasize that

the 1990 census currently is underway, and likely will result in another appointment.

In support of their laches argument, the defendants assert that in balancing the reasonableness of the plaintiffs' delay in bringing this action against the severity of the prejudice to the defendants, the Court should find this suit barred by laches. In particular, the Rule 19 defendants charge that the plaintiffs are guilty of inexcusable delay in bringing a suit in 1990 to challenge a 1981 apportionment plan, and that the resulting disruption of the election process would prejudice the defendants.

In response, the plaintiffs question whether laches is even available as a defense in an action brought under the Voting Rights Act. In addition, the plaintiffs argue that because the State defendants do not claim prejudice associated with the disruption of the election process, the Rule 19 defendants cannot independently claim prejudice.

## II. PARTIES IN THIS ACTION

Before discussing laches and equity principles, the Court feels compelled to first share several thoughts on the presence and absence of parties in this suit, and perceived difficulties resulting therefrom. In particular, the Court questions whether, based on the parties now joined in this action, the Court has the power to Order the relief that might ultimately be required if the plaintiffs succeed on the merits. The question arises because the Indiana Generaly Assembly, the governmental body vested with the authority and responsibility to apportion House and Senate districts, is not a party to this action.

Article 4, § 5, of the Indiana Constitution provides in relevant part: "The General Assembly elected during the year in which a federal decennial census is taken shall fix by law the number of Senators and Representatives and apportion them among districts according to the number of inhabitants in each district, as revealed by that federal decennial census." Thus, the

case. In fact, at the pretrial conference on this matter the plaintiffs withdrew their motion to

submit oral testimony on the laches issue.

clear language of § 5 provides that the General Assembly is responsible for apportionments every ten years.

■ Accordingly, a problem surfaces in this action because the General Assembly is not a party to this action. As stated previously, named as defendants in this cause are the Board, Gov. Bayh, in his official capacity as governor and as an *ex officio* Board member, Mills and Cox, in their official capacities as Board members, and various candidates for House Districts 49 and 51. Therefore, this Court lacks personal jurisdiction over the General Assembly as a whole. The fact that defendant Paul S. Mannweiler, for example, is an acting member (co-speaker) of the House, would not appear to provide this Court with jurisdiction over the entire General Assembly.

The plaintiffs apparently rest their jurisdictional foundation on the Board. However, the Board is not empowered to engage in reapportionment. The powers and duties of the Board are set forth in *Ind. Code* § 3–6–4–12. Among the powers given to the Board by this provision is the power to administer the election laws of the state (*Ind. Code* § 3–6–4–12(a)(1)) and the power to adopt rules to govern the fair, legal, and orderly conduct of elections (*Ind. Code* § 3–6–4–12(a)(2).

■ These provisions, however, do not supplant the General Assembly's constitutionally decreed responsibility for conducting periodic apportionments. The Board is merely an administrative body created by the legislature and as such has no power either to enact the law or declare a law unconstitutional or unenforceable for any reason. While the Board certainly is entitled to its opinion on whether an existing apportionment plan violates voting rights, it is not constitutionally empowered to grant relief.

The Indiana Supreme Court recognized this problem in *State v. Marion Superior Court*, 243 Ind. 307, 185 N.E.2d 18 (1962). In *Marion Superior Court*, the issue was whether a state court had jurisdiction to order the Board to reapportion the state and conduct an election accordingly. The Supreme Court determined it did not, and issued a writ of mandamus accordingly. In reaching this conclusion, the court stated that the authority vested in the Board "does not, under any theory, vest the board with the power and authority to make a reapportionment of the General Assembly or to conduct an election in any manner other than as provided by the election laws of the state ..." *Id.* 185 N.E.2d at 20. Thus, the Indiana Supreme Court has observed the inherent problems associated with the relief which the plaintiffs seek from the defendants in the case at bar.

The plaintiffs' complaint seeks a declaratory judgment that House Districts 49 and 51 violate § 2 of the Voting Rights Act, and a permanent injunction against holding additional elections for State Representative therein. As this suit has progressed, the plaintiffs also have made it clear that they are asking this Court to create a new, single-member district by combining precincts from Districts 49 and 51.

This Court no doubt has the power to declare that Districts 49 and 51 violate the Voting Rights Act, and presumably has the power to enjoin the Board from holding elections in violation of the Act. However, at this juncture the Court has severe reservations about its ability to order the General Assembly to adopt a court-ordered reapportionment plan without the General Assembly being a party to this action.

Whatever the reasons are for not naming the General Assembly as a defendant in this action, they need not be explored.[5]

**5.** While the reasons for this deficiency need not be examined, it is significant to note other voting rights cases which have in fact named as defendants the legislative body responsible for redistricting. *See, e.g., Jeffers v. Clinton*, 730 F.Supp. 196 (E.D.Ark.1989), and *Smith v. Clinton*, 687 F.Supp. 1310 (E.D.Ark.1988) (naming Arkansas Board of Apportionment); *Ketchum v.*

*City Council of City of Chicago*, 630 F.Supp. 551 (N.D.Ill.1985) (naming Chicago City Council); *Mac Govern v. Connolly*, 637 F.Supp. 111 (D.Mass.1986) (naming Senate and House chairmen of the Joint Special Committee on Redistricting, as well as the Joint Committee); *Simkins v. Gressette*, 631 F.2d 287 (4th Cir.1980) (naming South Carolina House and Senate);

The implications of this fact, however, cannot be ignored. For the federal judiciary to order the Board not to conduct elections in accordance with the legislature's 1981 apportionment plan, without the legislature being a party to the action, seems to this federal Court a very extraordinary exercise of federal authority. This is true even in a § 2 voting rights case wherein the intent of the legislature is not an issue.

■ In any event, even if a violation of the Voting Rights Act were found, at the very least the General Assembly should be given the first opportunity to correct the deficiency through reapportionment. *See Chavis v. Whitcomb*, 307 F.Supp. 1362, 1366–67 (S.D.Ind.1969), *rev'd on other grounds*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) (court-ordered reapportionment plan instituted only after the legislature failed to act); *Reynolds v. Sims*, 377 U.S. 533, 586, 84 S.Ct. 1362, 1394, 12 L.Ed.2d 506 (1964) (district court should not engage in redrawing district lines until after court finds existing lines unlawful and the legislature refuses to act); *Bandemer v. Davis*, 603 F.Supp. 1479, 1496 (S.D.Ind. 1984), *rev'd on other grounds*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (district court declared the reapportionment unconstitutional but provided that the legislature should have an opportunity to reapportion before court took further action).

This Court is duty bound to recognize that the federal judiciary functions within a system of federalism that entrusts the responsibility of legislative apportionment and districting primarily to the state legislature. *Chavis v. Whitcomb*, 305 F.Supp. 1364, 1392 (S.D.Ind.1969). The fact that this is a suit in equity does not change this result. As the Supreme Court stated in reversing the district court in *Chavis*, "The

remedial powers of an equity court must be adequate to the task, but they are not unlimited." *Chavis*, 403 U.S. at 161, 91 S.Ct. at 1878 (holding district court erred in "so broadly brushing aside state apportionment policy without solid constitutional or equitable grounds for doing so").

■ Herein lies the problem. Assuming without deciding that the Court were to find a violation of the Act in this case, and assuming further that the General Assembly were to refuse to reapportion to remedy this situation,[6] the Court would be powerless to order the General Assembly to so act. The General Assembly is not a party in this action, and even the broad powers of equity could not remedy this jurisdictional defect.

■ Nor does the fact that the governor is a defendant eliminate this deficiency. This Court cannot order the governor to perform an act that is constitutionally vested to the legislature. The governor's role in reapportionment is to decide whether to sign into law a redistricting plan adopted by the General Assembly. *Bandemer*, 603 F.Supp. at 1482. Accordingly, this Court is hesitant to undertake an examination of the merits of the plaintiffs' case where, if success on the merits resulted, this Court would be powerless to order the necessary relief.

This suit appears then to be an invitation from the defeated candidates and the executive branch to tell the legislature, prior to its opportunity to act on new census material, that its nine-year-old reapportionment using the 1980 census data violates the Voting Rights Act. This the Court is asked to do without input from the legislature and just prior to a constitutionally mandated reapportionment effort. The Court declines this invitation. Thus, the

---

*Bandemer v. Davis*, 603 F.Supp. 1479 (S.D.Ind. 1984), *rev'd*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) (naming Speaker of the House, President Pro Tem of Senate, and House and Senate chairman of Standing Committees on Elections and Apportionment).

**6.** This assumption is not as suspect as it might appear at first glance. For example, in *Chavis*, 305 F.Supp. at 1392, the Court stopped short of

entering an injunction so as to afford the State of Indiana an opportunity, such as through a special session of the legislature, to enact legislation to redistrict the state in accordance with federal constitutional requirements. However, the legislature failed to act, forcing the Court to order that the 1970 elections be conducted in accordance with districts as established by that court. *Chavis*, 307 F.Supp. at 1367.

failure of the plaintiffs to name as defendants the body responsible for reapportioning Districts 49 and 51 serves as a separate ground, independent from equity and laches, for denying the requested relief.

## III. VOTING RIGHTS CASE LAW

With these observations set forth, and the factual background in place, the Court now will review several key cases that have dealt with the principles of equity and the doctrine of laches. Though the laches doctrine is independent from the concept of equity, the two defenses are related and will be referenced in the same general discussion.

This Court's point of departure is *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The plaintiffs in *Reynolds* brought suit against various state election officials charging *inter alia* that the Alabama apportionment scheme violated the Equal Protection Clause. The Supreme Court, in affirming the district court's decision to order temporary reapportionment, noted the "difficult question" faced by courts in determining the proper remedial devices to be utilized in state legislative apportionment cases. *Id.* at 585, 84 S.Ct. at 1393. The Court then stated:

> [O]nce a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With

respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the Court's decree.

*Id.* Thus, the Supreme Court recognized in *Reynolds* that under certain circumstances a court might properly withhold relief in a legislative apportionment case.

The Fourth Circuit Court of Appeals has echoed the *Reynolds* reasoning more than once. In *Simkins v. Gressette*, 631 F.2d 287 (1980), black citizens and registered voters claimed that South Carolina's 1972 senate reapportionment plan resulted in unconstitutional vote dilution. The plaintiffs in *Simkins* did not bring suit until two days before the opening of the candidate filing period, and 16 days before the filing deadline. Despite the district court's attempts to expedite the case on its docket, no hearing was held until the filing deadline had passed and less than six weeks remained before the primaries.

In affirming the district court's dismissal of the complaint, the court focused on the plaintiffs' unexplained delay in bringing suit, the disruption that would be caused to the election process, and the impending national census that likely would require reapportionment. The Court stated:

> The last election for State senators in South Carolina occurred in November 1976. The results of that election, upon which plaintiffs so heavily rely here, were known to them at that time. Instead of bringing suit then, they choose to wait for more than three years until the eve of the 1980 elections. The record reflects no good reason for the delay. Such a delayed suit, if maintained, would clearly cause a major disruption in the election momentarily to begin in South Carolina. This disruption, coupled with the fact that 1980 is also the year of a national census which likely will require reapportionment in South Carolina,

places this case squarely within our holding in *Maryland Citizens*.[7]

*Simkins* at 296.

*Maryland Citizens* is an earlier reapportionment case decided by the Fourth Circuit. In *Maryland Citizens*, the district court dismissed an action wherein the plaintiffs sought empanelment of a three-judge court to determine whether the statute apportioning Maryland's General Assembly was constitutional. The plaintiffs also sought an injunction to prohibit the state from conducting the primary and general elections under the apportionment statute, as well as a directive that the state conduct 1970 elections in accordance with a new, constitutional reapportionment plan. The court of appeals affirmed the district court's refusal to convene a three-judge court and its dismissal of the complaint. In so doing, the court noted the unavailability of injunctive relief. *Id.* at 611. In particular, the court observed that the suit was filed only 13 weeks prior to the filing deadline for the primary. *Id.* at 609.

Thus, *Simkins* and *Maryland Citizens* further support the proposition that under certain circumstances a district court's discretion is properly exercised in refusing to intervene in the state election process. These cases suggest that courts faced with this issue should consider the proximity of upcoming elections, the potential disruption that would be caused to the election process, and whether a new apportionment is forthcoming.[8]

Likewise, in *Mac Govern v. Connolly*, 637 F.Supp. 111 (D.Mass.1986), suit was brought challenging the constitutionality of the legislative plan for apportioning statewide senate and representative districts in Massachusetts. The plaintiffs failed to bring suit until less than a month before nominations were due, roughly three months before the primary, and less than eight months before the general election. Noting the plaintiffs' delay and the fact that the election process was well underway, the court stated that the case presented a "classic instance" for the application of equity principles, and dismissed a portion of the complaint. *Id.* at 115. In so doing, the court stated:

> To grant the relief sought[9] ... would, without doubt, cause enormous disruption to Massachusetts voters, to candidates, and to the electoral process. The filing period would have to be postponed, and then reopened. Candidates who found themselves in new districts would have to start over, losing the benefits of earlier campaigning. And voters, having grown familiar with 1986 contestants, could find themselves confronted with candidates they do not know. As for the electoral process itself, it does not take a fertile imagination to picture the administrative havoc a midstream reapportionment would wreak.

*Id.*

The *Mac Govern* court also found it important that the plaintiffs' request for injunctive relief coincided with the normal decinnial reapportionment based on a statewide census. Observing that the state's census was not yet completed, the court stated, "[A]n injunction at this point could have the ironic effect of forcing a hasty reapportionment based on the already-superseded 1975 census figures, because they are, at least, readily available." *Id.* at 116. As a result, the court noted that intervention "would not only cause the dislocation

---

7. *Maryland Citizens for a Representative General Assembly v. Governor of Maryland,* 429 F.2d 606 (4th Cir.1970).

8. In *Maryland Citizens,* the court noted that a proposed amendment to the state constitution would require reapportionment every 10 years following each federal census. The Court stated, "Thus, in all likelihood, any reapportionment prior to the 1970 elections would be of an interim nature only, applicable only to them." *Id.* at 608. After concluding that the complaint was properly dismissed, the court stated, "The people of Maryland will have an opportunity to ratify the proposed constitutional amendment in November 1970. If they do not and if redistricting is not otherwise initiated for the 1974 legislative elections, a new justiciable cause of action may be asserted." *Id.* at 611–12.

9. The plaintiffs in *Mac Govern* asked the court to enjoin the defendants or any other state officials from taking any actions to prepare for or conduct the 1986 state senatorial and representative elections until districts were redrawn.

that accompanies any reapportionment, it might well cause it twice." *Id.*

Based on these circumstances, the *Mac Govern* court held that principles of equity prevented it from granting a portion of the relief sought in the plaintiffs' complaint. In explaining equity's role in its decision, the court stated:

> Equity demands that a federal court stay its hand when judicial relief makes no sense. This action, in which the remedy sought would come at great cost and yield results that are at best uncertain and, at worst, perverse, is plainly such a case. When the massive disruption to the political process of the Commonwealth is weighed against the harm to the plaintiffs of suffering through one more election based on an allegedly invalid districting scheme, equity demands that we deny relief.

*Id.*

The *Mac Govern* court also found laches to be an independent ground for reaching this result. The court stated that inexcusable delay was "clearly present" because the plaintiffs waited until 1986 to challenge a 1977 apportionment plan based on 1975 census figures. *Id.* The court also found this delay "plainly prejudicial" to the defendants because of the adverse consequences that would result to the state's electoral process if the court granted the plaintiffs' requested relief. *Id.*

A different result was reached in *Jeffers v. Clinton,* 730 F.Supp. 196 (E.D.Ark.1989). In *Jeffers,* suit was brought in 1989 against the Arkansas Board of Apportionment alleging that the 1981 apportionment plan violated the Voting Rights Act. The defendants argued that the suit was barred by laches in that it was filed too late. In addition, only the 1990 election remained to be conducted before the state would be reapportioned under the 1990 census. Nevertheless, the three-judge court balanced plaintiffs' delay against defendants' prejudice and found the defense of laches did not bar the action. Noting the issue was one of "judgment and degree," the court held that it would be unfair to the

plaintiffs to wait for another census. *Id.* at 203.

In reaching this decision, the court stated that the "clock" did not start running on the plaintiffs' delay in bringing suit until the Supreme Court's decision in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). The court reached this result by concluding that the law in the voting rights area had not "jelled" prior to *Thornburg. Jeffers,* 730 F.Supp. at 202. As for prejudice to the defendants, the court stated that the expense, trouble, and disruption of compliance would be substantial, but held that these consequences did not result because of any delay on the plaintiffs' part, but rather would have occurred whenever suit was filed. *Id.* at 202–03. The court also found it insignificant that the census data relied on by the litigants had become "increasingly stale" since 1980, stating, "[I]t is by no means clear that these data, however inaccurate they may become in terms of absolute numbers, will also be inaccurate in relative terms." *Id.* at 203.

The Court concluded its discussion of these issues with the following observation:

> To the extent that electoral confusion and disruption exceed what they would have been if the case had been filed earlier, we think that fairness and equal opportunity in voting are worth it. We will not say to these plaintiffs, 'Wait for another census. The time is not yet ripe.' They have heard these words too many times in the past.

*Id.*

In a dissenting opinion, Chief Judge Eisele argued that laches should bar the suit. The dissent attacked the majority's statement that the "clock" did not begin to run against the plaintiffs until the Supreme Court's ruling in *Thornburg. Id.* at 223. The dissent also noted the plaintiffs' delay would undermine the integrity and effectiveness of relief. *Id.* at 225. In response to the majority's holding, the chief judge wrote:

> [T]he majority believes it would be unreasonable to say to the plaintiffs that they should '[w]ait for another census.

The time is not yet ripe.' But the principle at stake here is not ripeness. If anything, this suit is overripe. The critical facts presented at trial, and which control much of the court's determination, are admittedly stale. The equitable principle implicit in withholding a grant of relief is predicated not upon the theory that the plaintiffs should wait, but upon the theory that they waited entirely too long.

*Id.* at 226.

Lastly, in *Smith v. Clinton,* 687 F.Supp. 1310 (E.D.Ark.1988), *aff'd mem.,* 488 U.S. 988, 109 S.Ct. 548, 102 L.Ed.2d 576 (1988), the issue of laches again surfaced and was rejected. In *Smith,* black registered voters filed suit on January 15, 1988, challenging the multimember structure of a dual-member Arkansas state legislative district.[10] The plaintiffs' originally filed a motion to enjoin the March 8, 1988, primary, but the court denied the motion. However, after reaching the merits of the plaintiffs' complaint, the court set aside the primary results, enjoined the defendants from certifying the winners of that primary as party nominees, and ordered the parties to submit proposed plans for separate districts. *Id.* at 1318.

In so doing, the court stated that "neither the doctrine of laches nor the expiration of an applicable limitations period presents an obstacle to the plaintiffs' case under the Voting Rights Act." *Id.* at 1312–13. The court reached this decision with minimal discussion, alloting only one paragraph of its opinion to the issue. However, the court offererd three reasons for this result.

First, the court described the injury to the plaintiffs as "continuing, suffered anew each time a State Representative election is held under the multimember structure." *Id.* at 1313. Second, the court emphasized that there had been "significant developments" since the 1981 Arkansas apportionment, notably, Congress' amending of the Voting Rights Act and the Supreme Court's decision in *Thornburg,* 478 U.S. 30, 106 S.Ct. 2752. Third, citing the plaintiffs' need to prove racial bloc voting, the court observed that evidence of racial bloc voting normally is unavailable "unless the structure has been in place for some time." *Smith,* 687 F.Supp. at 1313. Accordingly, *Smith* supports the plaintiffs' claim that laches is not a viable defense in the case at bar.[11]

While this discussion of cases is not exhaustive of all reapportionment decisions in which equity or laches has come into play,[12]

**10.** The challenged district was House District 48–49, a single geographic entity from which two state representatives were elected using at-large voting schemes.

**11.** The plaintiffs assert *Smith* more than simply supports their argument. The plaintiffs state, "The Supreme Court has also decided that laches is unavailable in a § 2 case under factual circumstances very nearly resembling those present here." (Plaintiff's Response at 2.) This conclusion is based on the fact that the Supreme Court affirmed, without opinion, the district court's decision in *Smith.* Summary affirmances no doubt have some significance in determining the state of the law. *See Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977). However, it does not follow that the Supreme Court's summary affirmance of *Smith,* in which the district court rejected the laches argument in one paragraph, means that the Supreme Court has decided that laches is unavailable in a case brought pursuant to § 2 of the Voting Rights Act. As the Supreme Court explained in *Mandel,* 432 U.S. at 176, 97 S.Ct. at 2240, a summary affirmance is an af-

firmance of the judgment only, and the rationale of the affirmance may not be gleaned solely from the opinion below. This explanation seems particularly appropriate here due to the district court's cursory treatment of the laches issue in *Smith.*

**12.** *See, e.g., Farnum v. Burns,* 548 F.Supp. 769 (D.R.I.1982) (holding that equity required ordering immediate relief); *Martin v. Venables,* 401 F.Supp. 611 (D.Conn.1975) (holding plaintiffs' delay in filing suit and fact the election machinery was in gear justified delaying relief despite unconstitutional apportionment plan); *McNeil v. Springfield Park District,* 666 F.Supp. 1208 (C.D.Ill.1987), *aff'd,* 851 F.2d 937 (7th Cir.1988) (holding equitable doctrine of laches barred injunctive relief against Park District elections); *Ketchum v. City Council of City of Chicago,* 630 F.Supp. 551 (N.D.Ill.1985) (holding legal and equitable doctrines supported holding special elections); *Knox v. Milwaukee Board of Election Commissioners,* 581 F.Supp. 399 (E.D.Wis.1984) (holding suit filed seven weeks prior to election seeking injunction to bar primary was barred by laches).

it nevertheless is illustrative of the way in which courts have viewed these issues in deciding whether to reach the merits. Key principles now will be extracted from these cases and applied in resolving the case at bar.

## IV.  KEY PRINCIPLES

■ In the Court's view, the previously referenced case law suggests several factors are relevant here. These factors are as follows: (1) what was the reason for the plaintiffs' delay in waiting until 1990 to challenge the 1981 apportionment?; (2) what possible prejudice will result if the Court grants the relief sought by the plaintiffs?; and (3) should this Court engage in reapportionment when a national census is underway and likely will result in reapportionment anyway? These factors will be addressed in turn.

### A.  *Plaintiffs' Delay*

This action was filed March 2, 1990, challenging an apportionment that occurred in 1981. Thus, the suit asks this Court to grant relief in response to a legislative decision made approximately nine years ago. The plaintiffs assert no claim was filed prior to this date because March 2 was the final day for candidate filings. By waiting until March 2, the plaintiffs assert that they were able to name as defendants all candidates in Districts 49 and 51. The plaintiffs state in part that this delay was a tactical decision to avoid potential problems that could result if a consent decree or a judgment in this case was "collaterally attacked by a candidate not designated as a party but subsequently filing for his or her candidacy." (Plaintiff's Brief Responding to April 17, 1990, Order at 7.)

Even assuming that the plaintiffs were justified in waiting until candidate filings for a given election were completed, this does not explain why the plaintiffs waited until the 1990 election year to challenge the 1981 apportionment plan. For example, the plaintiffs could have brought this suit after candidate filings were completed in 1988, in 1986, or in prior years.

In *Simkins*, 631 F.2d 287, the plaintiffs filed suit challenging the 1972 reapportionment 16 days before the filing candidate deadline, on the eve of the 1980 elections. The Court found "no good reason for delay" and affirmed the district court's dismissal of the complaint. *Id.* at 296. Similarly, in *Mac Govern*, 637 F.Supp. at 116, the court stated that inexcusable delay was "clearly present" because the plaintiffs waited until less than a month before nominations were due in 1986 to challenge a 1977 reapportionment plan. Likewise, the plaintiffs in this case have shown no good reason for waiting until March of 1990 to file this action.

In reaching this conclusion, the Court respectfully rejects the majority's reasoning in *Jeffers*, 730 F.Supp. at 202, that the "clock" did not start running on the plaintiffs' delay in bringing suit until the Supreme Court's 1986 decision in *Thornburg*, 478 U.S. 30, 106 S.Ct. 2752. Though *Thornburg* is a pivotal voting rights case, litigants were challenging apportionment schemes in court long before that decision was handed down.

The Court also has considered the argument that any delay should not be counted against the plaintiffs because racial block voting cannot be shown absent a continuing pattern of election results. The court in *Smith*, 687 F.Supp. at 1313, found this factor to be important, and rightly so. A court cannot on one hand require a plaintiff to show a voting structure exists over time, and on the other hand find that the resulting delay in bringing suit, needed to prove the plaintiff's case, is a ground for dismissing the action. Maintaining an action under such circumstances would be a Sisyphean task for any plaintiff.

However, the plaintiffs in case at bar did not have to wait until after candidates filed for offices for the 1990 primary to collect sufficient evidence to establish the existence of racial block voting. Representatives must run for election every two years. Ind. Const. art. 4, § 1. Therefore, whether racial block voting actually exists in Districts 49 and 51 could have been determined many years ago. The plaintiffs

have offered this Court nothing to justify its delay. Accordingly, the Court finds no good reason for the plaintiffs' delay in bringing this suit.

## B. *Prejudice*

The next factor this Court must examine is whether prejudice will result if the plaintiffs are granted the relief they seek. Specifically, that relief includes a permanent injunction against conducting additional elections in Districts 49 and 51 under the current apportionment plan, and creating a new, single-member district by combining precincts from both Districts. Before examining this issue in detail, however, the Court must determine whether the Rule 19 defendants have standing to raise the issue of prejudice.

### 1. Existence of standing

The plaintiffs argue that the Rule 19 defendants are without standing to assert the existence of prejudice in this action. In support of this assertion, the plaintiffs claim that the State defendants are the only parties who can raise the issue of prejudice. To this end, because the State defendants have not done so, the plaintiffs claim that the potential disruption of the election process that might result cannot be considered by the Court. As the plaintiffs put it, "[T]he significance of the State defendants' failure to raise laches cannot be understated." (Plaintiff's Brief Responding to April 17, 1990, Order at 7, n. 1.) The Court agrees, but for different reasons.

A significant factor in this lawsuit is that the State defendants have sided with the plaintiffs, and that they urge this Court to grant the relief requested by the plaintiffs. As stated previously, this Court will not endeavor to determine *why* the governor and the State Election Board have adopted this position. However, the *consequences* of this decision cannot be overlooked.

Were it not for the presence of the Rule 19 defendants in this cause, the Court would seriously examine whether this action should be dismissed for lack of a case or controversy, as required by Article III, § 2 of the Constitution. It appears to this Court that the State defendants believe that Districts 49 and 51 must be redrawn to eliminate vote dilution, but that the State defendants would prefer that this Court take the appropriate remedial action instead of the legislature. Were this Court to undertake a reapportionment absent a true controversy between the parties, serious judicial doctrines would be implicated, including the separation of powers and the political question doctrine. *But cf. Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (holding political question doctrine *not* violated in deciding reapportionment case). Therefore, the Court agrees with the plaintiffs when they state that the significance of the State defendants' failure to raise laches cannot be understated.

The presence of the Rule 19 defendants in this action, however, clearly eliminates any suggestion that a controversy does not exist. Yet their presence produces an ironic twist. The plaintiffs and the State defendants continuously downplay the significance of the Rule 19 defendants, to the extent that they suggest the Rule 19 defendants have no standing to raise the issue of prejudice. The irony of this is that without the Rule 19 defendants this action likely would be dismissed for the lack of a controversy between the parties. In addition, the apparent parallel interests between the plaintiffs and the State defendants undermine the confidence this Court has in the State defendants' claim that Court intervention in the state election process would not be disruptive and prejudicial.

Partly for this reason, the Court is of the opinion that the Rule 19 defendants should be permitted to raise the issue of prejudice. In addition, it must be kept in mind that if this Court were to intervene in the election process, the impact of such a decision would be felt well beyond the parties in this action. The voters and residents of Districts 49 and 51 also would be impacted. To the extent that Court intervention might disrupt or confuse voters in these districts, this Court also should consider this prejudice in deciding whether to reach the merits of this case. *See Mac*

*Govern,* 637 F.Supp. at 115 (holding prejudice included "enormous disruption to Massachusetts voters, to candidates, and to the electoral process"). If parties to this action (i.e. the Rule 19 defendants) have a legitimate fear that Court intervention could cause prejudice to the election process, this Court should examine those fears.

■ Finally, the Rule 19 defendants have standing to assert prejudice under the affirmative defense of laches. The Seventh Circuit has stated that the standing doctrine applies only to plaintiffs. *Wynn v. Carey,* 599 F.2d 193, 193 (7th Cir.1979). Courts that have taken a less conservative view have held that whether a defendant has standing to raise an affirmative defense is determined pursuant to a traditional standing analysis. *See e.g., FDIC v. Main Hurdman,* 655 F.Supp. 259, 269 (E.D.Cal.1987).

Under the traditional standing analysis, Article III requires a party to show that he personally has suffered some actual or threatened injury, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision. *See generally Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Love Church v. City of Evanston,* 896 F.2d 1082, 1084–85 (7th Cir. 1990).

As House candidates in the challenged Districts, the Rule 19 defendants rightly perceive vacating the primary results and redrawing Districts 49 and 51 as a threatened injury. These injuries include added expense, time, and effort that would result if additional campaigning were required. Furthermore, it even is possible that a candidate victorious in the primary might not be reslated if the primary results were vacated. Thus, these fact clearly present a

threatened injury fairly traceable to interfering with the election process. In addition, this injury would be avoided if the Rule 19 defendants succeed on their affirmative defenses. Accordingly, the Rule 19 defendants have standing to assert prejudice as part of the affirmative defense of laches even under a traditional standing analysis.

For all of these reasons, the Court finds that the Rule 19 defendants should be allowed to bring to this Court's attention any possible prejudice that might result if the Court were to intervene in the election process. Indeed, given that this is an equitable issue with impact well beyond the litigants, the existence of prejudice appears to be something the Court should consider even if no one raised the issue.

## 2. Existence of prejudice

Having determined that the issue of prejudice may properly be examined in this case, the Court now turns to identifying what that prejudice is.

The Rule 19 defendants assert that prejudice exists in this case because the "primary election is over, campaign committees are organized, contributions solicited, literature distributed, campaigns underway, and the general election is only five months away." (Rule 19 Defendants' Brief at 13.) Attached to the Rule 19 defendants' brief is an affidavit of Faye Mowery, clerk of the Marion County Circuit Court and Marion County. Mowery states in her affidavit that "the electorate, the candidates, and the electoral process itself would suffer enormous disruption, confusion, and cost if there had to be a second primary election" in Districts 49 and 51. (Mowery Aff. at ¶ 6.) At oral argument, the Rule 19 defendants asserted that the Indiana Constitution and statutory law would require a second primary.[13]

---

13. The Rule 19 defendants cite to Ind. Const. art 2, § 2, which states: "Every citizen of the United States, of the age of eighteen (18) years or more, who has been a resident of a precinct thirty (30) days immediately preceeding such election, *shall* be entitled to vote in that precinct." (Emphasis added.) The Rule 19 defendants also cite to *Ind.Code* § 3–10–1–2, which

states, "Each political party whose nominee received at least ten percent (10%) of the votes cast in the state for secretary of state at the last election *shall* hold a primary election under this chapter to select nominees to be voted for at the general election." (Emphasis added.) The mandatory "shall" language of these provisions was emphasized by the Rule 19 defendants for

The plaintiffs counter that the filing of a suit such as this one "is bound to cause some expense and inconvenience to candidates," but suggest that such inconvenience would be minimal. (Plaintiffs' Response at 10.) In addition, the plaintiffs dispute the Rule 19 defendants' position that a special primary would be required, stating that Indiana law does not require or permit the holding of a special primary election due to a candidate vacancy.

In support of their position, the plaintiffs cite to *Ind. Code* § 3–13–1–5, which states: "A candidate vacancy for a legislative office shall be filled by a caucus comprised by the precinct committeemen and vice committeemen of the political party whose precincts are within the senate or house district." Thus, the plaintiffs submit that were this Court to vacate the results of the May, 1990, primary, the vacancies should be filled pursuant to this statute.

If the vacancies were filled by caucus, rather than by calling a special primary, the plaintiffs assert disruption of the election process would be kept to a minimum. In seeking to downplay any confusion that might ensue, the plaintiffs submit the affidavit of William Crawford, a House candidate from District 51. Crawford states that there would be "little, if any" voter confusion in altering the Districts. (Crawford Aff. at ¶ 7.)

The Rule 19 defendants state that the vacancy-filling statute cited by the plaintiffs is "merely a housekeeping statute" to be used in unusual circumstances, such as where a candidate dies or moves away. (Reply Brief at 3.) These defendants further assert that before this vacancy-filling statute could be invoked, there must first be a legislative district in existence under some other provision of Indiana law.

In disputing the meaning and applicability of *Ind. Code* § 3–13–1–5, the parties are asking this Court to interpret a state statute prior to affording Indiana's courts the opportunity to do so. When federal courts are placed in this situation, principles of federalism and comity arise. The Supreme Court has stated that the policies of federalism and comity militate in favor of affording state judges the initial opportunity to consider the scope and validity of state statutes, particularly when the state law under consideration never has been applied and when its interpretation is uncertain. *Brockett v. Spokane Arcades, Inc.,* 454 U.S. 1022, 1023, 102 S.Ct. 557, 558, 70 L.Ed.2d 468 (1981) (Burger, C.J., dissenting from mem. affirmance). *See also Federated Department Stores, Inc. v. Moitie,* 452 U.S. 394, 407, 101 S.Ct. 2424, 2432, 69 L.Ed.2d 103 (1981) (state courts remain the preferred forum for the interpretation and enforcement of state law).[14] Accordingly, this Court declines the parties' invitation to interpret *Ind. Code* § 3–13–1–5 when Indiana case law provides no direction on this matter.

Not only is an interpretation of Indiana election law unwise in this instance, it also appears unnecessary. In the Court's view, substantial disruption of the election process would result under either alternative. This conclusion is reached through several avenues.

First is the affidavits submitted in this cause. Mowery states in her affidavit that if a second primary is required "enormous disruption" will result to the election process. (Mowery Aff. at ¶ 6.) On the other hand, Crawford states that "little, if any" voter confusion would result if vacancies were filled by caucus. (Crawford Aff. at ¶ 7.) While at first blush these affidavits might appear contradictory, a closer examination reveals otherwise.

Mowery's affidavit is based on the assumption that a second primary would be required. Crawford's affidavit is premised

---

the proposition that candidates must be selected through primary elections.

**14.** Numerous federal courts of appeal and district courts have exercised similar caution in the name of federalism. *See, e.g., Moore v. Dutton,* 432 F.2d 1281, 1285 (5th Cir.1970) (the principles of comity and federalism dictate that state courts be given the first opportunity to interpret state law); *Johnston v. United States,* 546 F.Supp. 879, 884 (D.Kan.1982) (the potential for federal infringement upon state sovereign exists whenever federal courts must interpret questions of state law).

on the belief that vacancies would be filled by caucus. Thus, Mowery's conclusion that enormous disruption to the election process would result if a second primary were required remains unrefuted. In addition, Crawford admits that even if candidates were chosen by caucus, voters whose districts would be changing would have to be notified of this fact. (Crawford Aff. at ¶ 7.)[15] Thus, some voter confusion is inherent regardless of how candidates are chosen.

■■■■■ In addition to the affidavits submitted in this cause, the Court also may take judicial notice of several important facts.[16] Attached to Mowery's affidavit is the "Official Political Calendar for the Year 1990." Accordingly, the Court takes judicial notice of the following facts: (1) the primary was conducted in Districts 49 and 51 on May 8; (2) the new voter registration period began May 15 and is underway; (3) both the Democrats and the Republicans have held their state conventions, at which successful primary candidates attended and the parties' platforms were announced; (4) the general election is less than five months away; the 1990 decennial census is underway and will result in reapportionment; and (5) according to the 1980 census, more 300,000 people live in Districts 49 and 51. Even if vacancies were filled by caucus, as the plaintiffs propose, these people would be prejudiced by not being allowed to have primary elections for

the candidates of their choice, as set forth in *Ind. Code* § 3–10–1–2.

In addition to these facts, the Court observes that in order to grant the relief sought by the plaintiffs, House Districts would have to be redrawn. Other facts also are subject to being judicially noted, but the point already has been made. For the plaintiffs to suggest to this Court that such drastic action would create only a minimal inconvenience is to ignore reality.

Even if a second primary were not ordered, at the very least campaigning among the affected precincts would be thrown into disarray, and voter confusion would result. However, if a second primary were ordered, the resulting confusion, cost, and disarray would be even more immense. Filing periods would have to be reopened, and campaigning would begin anew. All of this activity would have to be wedged in before the November elections, now less than five months away. As the court stated in *Mac Govern*, 637 F.Supp. at 115, "[I]t does not take a fertile imagination to picture the administrative havoc a midstream reapportionment would wreak."

There is some merit in the plaintiffs' argument that cases such as *Mac Govern* can be distinguished from the case at bar. In *Mac Govern*, the plaintiffs challenged the entire state apportionment plan. By contrast, in the case at bar the plaintiffs' challenge affects only Districts 49 and 51. Therefore, it is logical to assume that the

---

**15.** Parts of Crawford's affidavit clearly are deficient. For example, Crawford makes the following statement in his affidavit: "Pursuant to Indiana Election laws, the vacancies created by the Court's voiding of the results of the May 1990 primary in House District 51 would be filled by a caucus of precinct committeemen." (Crawford Aff. at ¶ 5.) Crawford relates that his opinions are based on his "18 years of personal experience in running for election" and urges in his affidavit that this Court "hear the merits of plaintiffs' voting rights claim." (Crawford Aff. at ¶¶ 4 and 8.)

Crawford's statement regarding the filling of vacancies is a conclusion of law and therefore is of no import to this Court. In addition, in light of the judicially noted facts in this case, Crawford's conclusion that minimal if any prejudice would result is unreasonable, and not supported by "specific facts" as required by Rule 56. This Court is not required to accept an affidavit

"when the declaration makes no sense." *Mid-State Fertilizer v. Exchange National Bank,* 877 F.2d 1333, 1339 (7th Cir.1989). The *Mid-State* case shows that the Seventh Circuit adopted the position set forth in *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), that courts may look into the factual context of the proferred evidence to determine whether such evidence should even be considered.

**16.** A court properly may take judicial notice of facts at either the motion to dismiss stage or the summary judgment stage. *Gomez v. Illinois State Board of Education,* 811 F.2d 1030, 1039 (7th Cir.1987); *Toney v. Burris,* 829 F.2d 622, 626–27 (7th Cir.1987); *Mullis v. U.S. Bankruptcy Court Dist. of Nevada,* 828 F.2d 1385, 1388 (9th Cir.1987), *appeal dismissed, cert. denied,* 486 U.S. 1040, 108 S.Ct. 2031, 100 L.Ed.2d 616 (1988).

implementation of reapportionment into two districts would be less troublesome than on a statewide level.

Nevertheless, the potential for voter confusion and assorted problems is just as great *in the specifically challenged districts* as it would be whether two districts were involved or whether the entire state was reapportioned. It cannot realistically be argued that granting the relief sought by the plaintiffs at this late a date, whether or not this would require holding another primary, would not create election turmoil. Accordingly, the Court finds that an enormous amount of prejudice to the defendants and to the election process as a whole exists in this case.

### C. *1990 Census*

The final issue before this Court is whether a 1990 reapportionment should be undertaken in view of the fact that the current national census likely will result in reapportionment anyway. The Court finds that this factor also weighs heavily against proceeding to the merits of this case.

Ordering a reapportionment under these circumstances is troubling for several reasons. First, the Court is concerned that the 1980 census information, upon which the plaintiffs' complaint is founded and upon which any reapportionment would be conducted, is "stale." One concern that immediately comes to mind is whether 1980 census information is accurate enough in 1990 to allow the Court to rely on it in fashioning relief. This is a particularly relevant inquiry in light of the extraordinary relief sought by the plaintiffs.

Second, the 1990 census data will require another reapportionment. Therefore, it is proper to question whether it is fair or reasonable to require such immense expenditures of time and money to create, for one election, districts whose lines will probably be changed in another year. In *Simkins*, 631 F.2d at 296, the fact that the plaintiffs waited to bring suit until 1980, a national census year, weighed strongly in that court's decision that the suit was properly dismissed. The reasoning in *Simkins* and similar cases suggests this Court also

should refrain from granting relief of such an interim nature.

As a final census-related observation, the Court notes that the plaintiffs' proposed single-member district would contain a black voting age population of only 50.27% (18,223 of 36,251). The Rule 19 defendants claim that this percentage is insufficient in the remedial context, where 65% has achieved the "standard acceptance" to enable blacks a fair opportunity to participate in the political process. The plaintiffs respond by stating that 65% is not a required minimum. Rather, all that must be shown is that blacks comprise a majority of the voting age population in the proposed single-member district.

Indeed, in *Ketchum v. Byrne*, 740 F.2d 1398, 1416 (7th Cir.1984), *cert. denied*, 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985), the court stated, "Numerous courts have either specifically adopted or tacitly approved the use of this 65% figure." However, the Seventh Circuit specifically stated in *Ketchum* that this figure may have to be reconsidered and adjusted in light of "new information" and changing circumstances. *Id.* at 1416, nn. 20, 21. *See also Neal v. Coleburn*, 689 F.Supp. 1426, 1438 (E.D.Va.1988) (65% not a required minimum, but rather a flexible goal).

The problem that concerns the Court is that this 50.27% figure is based on 1980 census information. Whether the plaintiffs' proposed single-member district would have a black voting majority in 1990 is a matter of speculation. This observation is yet another unsettling circumstance urging this Court to stay its hand in this matter.

## V.  CONCLUSION

The case law outlined in today's holding and the key principles extracted therefrom make it clear that it is within this Court's equitable discretion whether to grant the Rule 19 defendants' motion for summary judgment. After carefully considering all the issues raised by the parties, both in their briefs and at oral argument,

the Court finds that the defendants' motion should be granted.[17]

This conclusion is justified on several fronts. As a preliminary matter, the Court is concerned that the General Assembly is not a party to this action. Similarly, the Court is disquieted with the fact that the State defendants have sided with the plaintiffs. From these reservations, two problems spring forth. First, the Court is troubled at the possibility that history might repeat itself, as it often does, and the General Assembly will not reapportion voluntarily. If this were to occur, this Court might encounter jurisdictional limitations in ordering the General Assembly to adopt a court-made reapportionment plan. Second, it cannot be forgotten that the Indiana Constitution mandates that reapportionment is a legislative funtion, not a judicial one.

In addition, summary judgment is appropriate because this action is barred by the doctrine of laches. The Court finds the plaintiffs are guilty of inexcusable delay in failing to bring this action until 1990, on the eve of the election, and further finds that this delay will prejudice the Rule 19 defendants and the election process in general. Finally, equitable principles demand the same result. The November 6th general election is rapidly approaching, and it would be unwise to throw the election process into disarray in order to hastily grant extraordinary relief of an interim nature.

A new justiciable cause of action may be brought if the legislature does not act to sufficiently address the plaintiffs' voting rights concerns. Nevertheless, the decision in the matter presented to this Court is clear. Accordingly, for the reasons set forth herein, the Rule 19 defendants' motion for summary judgment is GRANTED, and this cause is DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

---

17. The fact that this is an action in equity does not prevent this Court from granting the defendants' motion for summary judgment. It is true that earlier case law frowned upon summary disposition in equity proceedings. *See Eccles v. Peoples Bank of Lakewood Village, Cal.,* 333 U.S. 426, 434, 68 S.Ct. 641, 645, 92 L.Ed. 784 (1948) (noting equity practice that "tended away from a procedure based on affidavits and interrogatories, because of its proven inefficiencies"). Similarly, the Seventh Circuit stated nearly 40 years ago in *Seaboard Surety Company v. Racine Screw Company,* 203 F.2d 532, 534 (7th Cir. 1953), that the rule of summary judgment "does not encompass a situation wherein the relief sought is not allowable as a matter of law or of right but is dependent upon a discretion to be exercised by the court."

These holdings clearly conflict with the modern approach to summary judgments. As stated in 10A *Wright, Miller & Kane,* § 2731 at 297 (1983), "The *Seaboard Surety* case has not been followed, nor should it be. One of the primary aims of the federal rules has been the elimination of procedural differences between actions that historically were brought 'at law,' and those initiated 'in equity.' Summary procedures to abort nonmeritorious litigation and avoid unnecessary expense and delay are important in equitable as well as legal actions. Thus, if there really is 'no genuine issue of material fact,' the court should have the power to terminate the litigation on a summary judgment motion, rather than engage in a potentially costly trial."

The Supreme Court no doubt embraces this view. The high Court's 1986 trilogy of cases demonstrated a substantial warming toward summary judgments in federal courts. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Seventh Circuit has followed the Supreme Court's lead in this area, as seen in *Collins v. Associated Pathologists Ltd.,* 844 F.2d 473 (7th Cir.1988), and *Spellman v. Commissioner,* 845 F.2d 148 (7th Cir.1988). In fact, the Seventh Circuit expressly rejected the notion that summary judgment is improper in cases brought pursuant to § 2 of the Voting Rights Act. *See McNeil v. Springfield Park District,* 851 F.2d 937, 942–43 (7th Cir. 1988).